## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| LORETTO O'REILLY, Jr.,<br>HEALTHY GULF, COALITION<br>FOR RESPONSIBLE ZONING, AND<br>SIERRA CLUB AND ITS DELTA<br>CHAPTER | *<br>*<br>*<br>*<br>* |
| *Plaintiffs*, | *<br>* |
| v. | *<br>* |
| LIEUTENANT GENERAL SCOTT A.<br>SPELLMON and UNITED STATES<br>ARMY CORPS OF ENGINEERS, | *<br>*<br>* |
| *Defendants*. | *<br>* |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## Introduction

1.      This action is a challenge to the U.S. Army Corps of Engineers' ("Corps'")

approval of two dredge and fill permits under Section 404 of the Clean Water Act, 33 U.S.C. §

1344, for the destruction and paving-in of a total of 40 acres of forested wetlands near

Covington, St. Tammany Parish, Louisiana. Flooding in south Louisiana has reached epic

proportions, and the two projects are in high-risk flood areas that have seen recent catastrophic

flooding. Among the most critical functions of wetlands is their capacity to absorb floodwaters,

and it is one of the reasons that the Corps' own regulations discourage the unnecessary

destruction of "[w]etlands which serve as valuable storage areas for storm and flood waters." 33

C.F.R. § 320.4(b)(2)(v). The statutes that govern the Corps' granting of permits to destroy

resources so essential to the public interest and the environment – the National Environmental

Policy Act and the Clean Water Act – therefore require a robust, complete, "hard look" at the impacts of and alternatives to such permitting, and this includes the need to not use tunnel vision to look individually at single actions, but to systematically examine the cumulative effects of the individual permitting actions in light of past, present, and reasonably foreseeable future actions.

2.      The challenged Corps actions – the Timber Branch II development permit and Ochsner Blvd. Extension road permit – are two of dozens of Section 404 permits that the Corps has issued in west St. Tammany Parish, which have collectively eliminated hundreds of acres of flood-absorbing wetlands and replaced them with impermeable concrete, but the Corps has conducted no cumulative impact analysis of these projects in light of past, present, and reasonably foreseeable future actions.

3.      The region of the parish in which the challenged projects are located has experienced significant, rapid development involving the filling-in of many acres of wetlands permitted by the Corps. Despite the value of these wetlands for critical functions such as flood absorption, maintenance of water quality in the surrounding streams, and providing a high-quality habitat for a rich array of wildlife, and despite the severe flooding that residents and business owners in the area have suffered in recent years, the Corps did no analysis of the impacts of the Timber Branch II and Ochsner Extension Road projects on flooding, wildlife, or water quality.

4.      The Corps' failure to analyze cumulative impacts includes its failure to consider the impacts that will result from the Timber Branch II permittee's plan to develop the remainder of the tract on which Timber Branch II would be located. The Corps ignored the proof of this plan submitted to it during the comment period, and the permittee is now moving forward with those plans by presenting them to St. Tammany Parish for rezoning approval.

5.      The Corps' failure to address the impacts of its permitting in this area is all the more egregious because its permitting of a Timber Branch II development on the same site in 2003 was enjoined by a federal court as in violation of the National Environmental Policy Act (NEPA) because the Corps "abused its discretion in failing to give an in depth analysis to the cumulative effects of the project . . . ." *O'Reilly v. U.S. Army Corps of Engineers*, No. 04-940, 2004 WL 1794531, at *5 (E.D. La. Aug. 10, 2004).

6.      As set forth below, the Corps' approval of the Timber Branch II development and the Ochsner Blvd. Extension Road (collectively, "the projects") without preparing an Environmental Impact Statement, without an adequate Environmental Assessment, and without adequate attention to the environmental impacts of such development violates NEPA, 42 U.S.C. § 4321, and the Clean Water Act, 42 U.S.C. § 1344.

7.      Plaintiff O'Reilly and the Plaintiff organizations' members own property, live, work, and recreate near the projects, as close as a half-mile from Timber Branch II. They have grave concerns about the impact to their lives from the Corps' permitting of these two projects, particularly in light of the damaging effects –  including severe flooding, loss of wildlife habitat and traffic – already realized as a result of unlimited Corps permitting in the area. They request declaratory and injunctive relief vacating the Corps' approval of the permits and enjoining the permits until all legal requirements have been satisfied.

## Jurisdiction and Venue

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201 and 2202. Plaintiffs have a right to bring this action pursuant to, inter alia, the Administrative Procedure

Act (APA), 5 U.S.C. §§ 701-706.  This action arises under NEPA, 42 U.S.C. § 4321 et seq., and the Clean Water Act, 33 U.S.C. § 1251 et seq.

9.      Under 28 U.S.C. § 1391(e), venue is proper in the Eastern District of Louisiana because a substantial part of the events or omissions at issue have occurred in this district.

**Plaintiffs**

10.     Plaintiff Loretto O'Reilly, Jr. owns property less than one mile from the proposed Timber Branch II development and within two miles of the proposed Ochsner Extension Road. She was a plaintiff on the 2004 *O'Reilly* injunction.

11.     Plaintiff Healthy Gulf is a non-profit corporation organized under the laws of Louisiana. Healthy Gulf is committed to restoring the Gulf of Mexico to an ecologically and biologically sustainable condition. Healthy Gulf collaborates with and serves communities who love the Gulf of Mexico by providing the research, communications, and coalition-building tools needed to reverse the long pattern of over-exploitation of the Gulf's natural resources. Healthy Gulf works throughout all five Gulf States to advance issues important to the health of the Gulf, including the protection of wetlands. Healthy Gulf's membership includes individuals who reside and recreate near the proposed projects and who will be harmed by the projects' impacts, and it seeks to protect its members' use and enjoyment of their homes, neighborhoods, and the surrounding environment.

12.     Plaintiff Coalition for Responsible Zoning is a Louisiana corporation that promotes purpose-driven planning and zoning. Its goal is to protect the health, safety, and welfare of people in St. Tammany Parish, which includes conservation of some of the parish's natural environment. It advocates for this goal before governmental entities like St. Tammany Parish zoning bodies and officials as well as the U.S. Army Corps of Engineers. Coalition for

Responsible Zoning has members who reside and recreate near the proposed projects and who will be impacted by the proposed projects.

13.     Plaintiff Sierra Club and its Delta Chapter is a non-profit organization with chapters in all fifty of the United States, including Louisiana. Its mission is to protect and preserve the natural environment and to practice and promote the responsible use of Earth's ecosystems and resources. The Delta Chapter has over 3,500 members, some of whom live or recreate in St. Tammany Parish near the proposed projects and who will suffer from their impacts.

14.     Plaintiffs seek to protect their interests in a safe environment through the promotion of conservation, recreation, and aesthetic values.

15.     The projects will irreparably harm Plaintiff O'Reilly and Plaintiff organizations' members' economic, aesthetic, conservational, wildlife, and recreational interests. The economic interests that the projects threaten include the flooding of homes and other property, the decreased property values as a result of the increased risk of flooding, and higher premiums for insurance.

16.     The projects will additionally permanently impair Plaintiff O'Reilly and the Plaintiff organizations' members' use and enjoyment of the resources of the area surrounding the projects through traffic, noise, and diminished aesthetics.

17.     Plaintiffs' members are residents of Louisiana who use the Little Tchefuncte River and the Timber Branch Tributary for recreation and intend to do so in the future.  The projects will impair Plaintiffs' recreational activities, as they will diminish water quality of the Little Tchefuncte and the Timber Branch Tributary and put pressure on these waterbodies and their banks through the impact of scouring floodwaters.

18.     Plaintiff organizations' members enjoy observing wildlife in the area, including deer, bobcat, coyotes, raccoons, armadillo, beaver, ducks, hawks, eagles, and many types of birds.  The proposed projects will impair Plaintiffs' enjoyment of observing wildlife, as the projects will destroy a significant amount of wildlife habitat should they move forward.

19.     This Court can redress Plaintiffs' injuries with a ruling in their favor.

## Defendants

20.     Defendant Lieutenant General Scott A. Spellmon is the U.S. Army Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers. Plaintiffs sue Lieutenant General Spellmon in his official capacity. Lieutenant General Spellmon (or his successors in office) is the federal officer personally responsible for compliance with any injunction that this Court issues.

21.     The Corps is responsible for issuing permits under Section 404 of the Clean Water Act, 33 U.S.C. § 1344. The Corps prepared the Environmental Assessment (EA) for these projects, made findings of no significant impact (FONSI) declaring that Environmental Impact Statements were not necessary, and issued permit number MVN-2018-0215-EPP for the Timber Branch II project ("2020 Timber Branch II" or "Timber Branch II") and permit number MVN-2017-00075-EPP for the Ochsner Blvd. Extension Road project ("extension road," "Ochsner Blvd. Extension," or "Extension project").

## 2003 Timber Branch II Project and Prior Litigation

22.     In 2003, the Corps approved a Section 404 permit for applicant August Hand authorizing the development and construction of a subdivision called Timber Branch II ("2003 Timber Branch II").

23.     The 2003 Timber Branch II project was proposed to be developed on 81.58 acres of a 200-acre tract of land in St. Tammany Parish west of Covington and would have required dredging and filling 39.54 acres of pine flatwood/savannah wetlands adjacent to the Little Tchefuncte River and Timber Branch Tributary.

24.     In its decision issuing the 2003 Timber Branch II Permit, the Corps acknowledged that in the prior seven years it had granted 72 permits within a three-mile radius of the project site.  These permits affected over 400 acres of wetlands.

25.     The 2003 Timber Branch II Permit was challenged in court. *See O'Reilly v. U.S. Army Corps of Engineers*, No. 04-940, 2004 WL 1794531, at *5 (E.D. La. Aug. 10, 2004).

26.     In *O'Reilly,* the U.S. District Court for the Eastern District of Louisiana (the "E.D. La.") issued an injunction on the 2003 Timber Branch II Permit until the Corps completed a more thorough environmental review of the project. *Id.* at *5-6 (E.D. La. 2004).

27.     The E.D. La. held that "the Corps . . . abused its discretion in failing to give an in depth analysis to the cumulative effects of the project . . . ." and that "in light of the long-term and irreversible environmental impacts associated with this project, the Corps' action is wholly at odds with NEPA." *Id.*

28.     The Fifth Circuit affirmed the E.D. La.'s reversal of the Corps' decision to issue the Timber Branch II permit, finding that "the Corps acted arbitrarily in issuing a FONSI based on an EA that fails to articulate how the mitigation measures will render the adverse effects insignificant and to consider the cumulative effects of the project, area urbanization, and permits issued to third parties." *O'Reilly v. U.S. Army Corps of Engineers*, 477 F.3d 225, 227 (5th Cir. 2007).

29.     The Fifth Circuit issued an injunction, stating that it "enjoin[s] the Corps from issuing a § 404 permit herein until further orders of the district court consistent with this opinion[.]" *Id.* at 240.

30.     The Corps did not seek further direction from the district court.

31.     In 2020, the Corps approved the permit being challenged in the instant case, for a substantially similar fill project on the same tract of land for a project with the same name— Timber Branch II.

32.     Like 2003 Timber Branch II, 2020 Timber Branch II will require the destruction of a substantial acreage of wetlands, which will increase the threat of flooding in an area already heavily burdened by over-development and wetland loss.

33.     Analyses of the 2020 Timber Branch II permitting process indicate a continued high concentration of permits granted in the area immediately surrounding the proposed development.

## Legal Background

### *APA*

34.     The APA provides for judicial review of final agency actions.  Thus, the APA provides the vehicle for redress of the Corps' failure to comply with NEPA and the Clean Water Act in issuing the Timber Branch II and Ochsner Blvd. Extension permits. "A person" who is "adversely affected or aggrieved by agency action" within the meaning of NEPA and the Clean Water Act is entitled to judicial review thereof.  5 U.S.C. § 702.

35.     The APA defines a person as "an individual, partnership, corporation, association or public or private organization other than an agency[.]" 5 U.S.C. § 551(2). Agency means

"each authority of the Government of the United States . . . ." 5 U.S.C. § 701(b)(1); 5 U.S.C. § 551(1).

36.     Agency action includes the whole or a part of an agency order. 5 U.S.C. § 551(6).

37.     The Corps' decisions to grant the Timber Branch II and Ochsner Blvd. Extension Road permits are final agency actions.

38.     A court reviewing final agency action shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

### Section 404 of the Clean Water Act

39.     Under the Clean Water Act, it is federal policy "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

40.     The Clean Water Act prohibits the "discharge of any pollutant by any person" into navigable waters without a permit. 33 U.S.C. § 1311(a); *see also* 33 U.S.C. § 1362(12).

41.     Under the Clean Water Act, "navigable waters" include wetlands adjacent to navigable waters. *See* 33 C.F.R. § 328.3(a)(4) (2020).

42.     Under the Clean Water Act, the Corps "may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a).

43.     The Clean Water Act mandates that the Corps publish notice of an application for a dredge and fill permit only after "an applicant submits all the information required to complete an application for a permit . . . ." *Id.*

44.     Pursuant to authorization under the Clean Water Act, the Environmental Protection Agency (EPA) promulgated mandatory guidelines that govern the Corps' evaluation

and issuance of such permits. 33 U.S.C. § 1344(b)(1). These requirements are known as the §

404(b)(1) Guidelines ("Guidelines").

45.     The Guidelines prohibit the "discharge of dredged or fill material if there is a

practicable alternative to the proposed discharge which would have less adverse impact on the

aquatic ecosystem, so long as the alternative does not have other significant adverse

environmental consequences." 40 C.F.R. § 230.10(a) (2020).

46.     In cases where the discharge is proposed for wetlands and the project is not water-

dependent, the Guidelines mandate a presumption that practicable alternatives are available

unless clearly demonstrated otherwise. *Id*. § 230.10(a)(3).

47.     This presumption of practicable alternatives "is very strong." *Buttrey v. United

States*, 690 F.2d 1170, 1180 (5th Cir. 1982).

48.     The Guidelines further require the Corps to presume that where a project is not

water-dependent, "all practicable alternatives . . . [that] do not involve a discharge into a special

aquatic site . . . have less adverse impact on the aquatic ecosystem, unless clearly demonstrated

otherwise." 40 C.F.R. § 230.10(a) (2020).

49.     The Guidelines specifically require the Corps to "examine practicable alternatives

to the proposed discharge . . . ." *Id.* § 230.5(c). That examination must include the alternatives of

"not discharging into the waters of the [United States] or discharging into an alternative aquatic

site with potentially less damaging consequences." *Id.*

50.     This alternatives analysis is an essential part of the Guidelines and, therefore, part

of the public notice to which public commenters must have "sufficient information [for] . . .

meaningful comment." 33 C.F.R. § 325.3(a) (2020).

51.     In addition, the Guidelines prohibit the discharge of fill material that will "cause or contribute to significant degradation" of wetlands and navigable waters. 40 C.F.R. § 230.10(c) (2020). Effects contributing to significant degradation must be considered individually and collectively. *Id.*

52.     The Guidelines require the Corps to evaluate the adverse impacts a fill project may impose on human welfare, wildlife, "aquatic ecosystem diversity, productivity, and stability . . . [including] loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients, purify water, or reduce wave energy[,]" and "recreational, aesthetic, and economic values." *Id*. § 230.10(c)(1)-(4).

53.     The Guidelines require an analysis of the cumulative effects on the aquatic ecosystem of the discharge or dredged or fill material. *Id.* § 230.11(g).

54.     The Guidelines define cumulative impacts as "the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material." *Id.* § 230.11(g)(1).

55.     The Guidelines state that "no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." *Id.* § 230.10(d). These steps include the requirement that an applicant mitigate unavoidable impacts to the environment.

56.     The Guidelines provide: "The fundamental objective of compensatory mitigation is to offset environmental losses resulting from unavoidable impacts to waters of the United States authorized by DA permits." *Id.* § 230.93(a)(1). The Corps must base compensatory mitigation on wetlands "capable of compensating for the aquatic resource functions that will be lost as a result of the permitted activity." *Id*.; *see also* 33 C.F.R. § 320.4(r) (2020).

57.     The Corps New Orleans District's method of determining the amount and type of

mitigation required for compensatory mitigation on Section 404 permits, the Louisiana Rapid

Assessment Method (LRAM), does not consider, or attempt to compensate for, cumulative

impacts.

*NEPA*

58.     NEPA directs that:

> [T]o the fullest extent possible . . . all agencies of the Federal Government shall . .
> . include in [all] major Federal actions significantly affecting the quality of the
> human environment, a detailed statement by the responsible official on--(i) the
> environmental impact of the proposed action, (ii) any adverse environmental effects
> which cannot be avoided should the proposal be implemented, (iii) alternatives to
> the proposed action, [and] (iv) the relationship between local short-term uses of
> man's environment and the maintenance and enhancement of long-term
> productivity . . . .

NEPA § 102(C), 42 U.S.C. § 4332(C).

59.     NEPA requires federal agencies to "utilize a systematic, interdisciplinary

approach" to consider the environmental impacts "in planning and in decision-making which

may have an impact on man's environment." *Id.*

60.     Inherent in NEPA's mandates is the requirement for agencies to evaluate the

cumulative impacts of the proposed actions in light of related actions.

61.     The Council on Environmental Quality, an agency within the Executive Office of

the President, has promulgated regulations implementing NEPA ("CEQ Regulations"). 40 C.F.R.

§ 1500 et seq. (2019). These regulations are binding on all federal agencies, including the Corps.

40 C.F.R. § 1500.3 (2019).

62.     The 2019 version of the CEQ Regulations apply to the Corps' decisions to issue

the Timber Branch II and Ochsner Blvd. Extension permits.

63.     The CEQ regulations provide that "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken" and that "public scrutiny [is] essential to implementing NEPA." 40 C.F.R. § 1500.1(b) (2019).

64.     NEPA requires agencies to take a "hard look" at the environmental consequences of the projects they permit. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976).

65.     A federal agency considering a proposal for major federal action may prepare an Environmental Assessment in order to determine whether an Environmental Impact Statement is required. 40 C.F.R. § 1501.4(c) (2019). If the Environmental Assessment indicates that the project is likely to have a significant impact on the human environment, the agency must prepare an Environmental Impact Statement. *Sabine River Auth. v. United States Dep't of Interior*, 951 F.2d 669, 677 (5th Cir. 1992).

66.     An agency seeking to determine whether a proposed activity will have a "significant" impact on the environment must consider both the "context" and the "intensity" of the project's effects.  40 C.F.R. § 1508.27 (2019).

67.     "Context . . . means that the significance of an action must be analyzed in several contexts such as a society as a whole (human, national), the affected region, the affected interests, and the locality. . . .  Both short- and long- term effects are relevant." *Id*. § 1508.27(a) (2019).

68.     In evaluating intensity, an agency must consider the "[u]nique characteristics of the geographic area such as proximity to…wetlands…or ecologically critical areas," the degree to which the effects of the project are likely to be "highly controversial," and "[w]hether the

action is related to other actions with individually insignificant but cumulatively significant impacts . . . ." *Id*. § 1508.27(b) (2019).

69.    The CEQ regulations require agencies to consider direct, indirect, and cumulative impacts of a proposed action.  *Id*. § 1508.25(c) (2019).

70.    Direct effects are those "caused by the action and occur at the same time and place." *Id.* § 1508.8(a) (2019).

71.    Indirect effects include those "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b) (2019). "Effects includes ecological . . . , aesthetic, historic, cultural, economic, social, or health, whether direct, indirect or cumulative." *Id.*

72.    "A cumulative impact is the impact on the environment which results from the incremental impact of the action when added with other past, present, and reasonably foreseeable future actions" taken by any agency or individual. *Id.* § 1508.7 (2019). "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

### The Corps' Permitting Regulations

73.    The Corps' regulations for evaluating permit applications are "applicable to the review of all applications for [Department of the Army] permits." 33 C.F.R. § 320.4 (2020).

74.    The Corps' decision to issue a permit requires an "evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." *Id*. § 320.4(a)(1).

75.     The Corps' evaluation of impacts must consider a number of factors and their cumulative effects, including conservation, economics, aesthetics, general environmental concerns, wetlands, fish and wildlife values, flood hazards, and floodplain values. *Id.*

76.     The Corps' regulations provide: "Most wetlands constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest." *Id.* § 320.4(b)(1)

77.     The Corps' regulations detail wetlands considered to perform functions important to the public interest as including: "Wetlands the destruction or alteration of which would affect detrimentally natural drainage characteristics . . . ; [ ] Wetlands which serve as valuable storage areas for storm and flood waters; [ ] Wetlands which serve significant water purification functions; and [ ] Wetlands which are unique in nature or scarce in quantity to the region or local area." *Id.* § 320.4(b)(2)(iii), (v)-(viii).

78.     The Corps' regulations provide: "Although a particular alteration of a wetland may constitute a minor change, the cumulative effect of numerous piecemeal changes can result in a major impairment of wetland resources. Thus, the particular wetland site for which an application is made will be evaluated with the recognition that it may be part of a complete and interrelated wetland area." *Id.* § 320.4(b)(3).

79.     The Corps' regulations provide: "No permit will be granted which involves the alteration of wetlands identified as important by paragraph (b)(2) of this section or because of provisions of paragraph (b)(3), of this section unless the district engineer concludes, on the basis of the analysis required in paragraph (a) of this section, that the benefits of the proposed alteration outweigh the damage to the wetlands resource." *Id.* § 320.4(b)(4).

**Factual Allegations**

*Timber Branch II Permit*

80.     On February 6, 2018, Bruce Wainer of All State Financial Company (the "Applicant") applied to the Corps for a Section 404 wetlands fill permit to create the Timber Branch II subdivision, a proposed multi-use commercial and residential development in unincorporated St. Tammany Parish southwest of Covington ("the Project").

81.      The total project acreage of Timber Branch II as described in the application is 69.19 forested acres. Wetlands comprise 24.58 of these acres.

82.     The Corps considered the scope of its Timber Branch II analysis under NEPA to be the 69.19 total project acreage.

83.     The Timber Branch II wetlands are waters of the United States under the Clean Water Act and subject to the Corps' permitting jurisdiction.

84.     The Corps issued a jurisdictional determination for the Timber Branch II site on March 11, 2015 that was valid for a period of five years and expired on March 11, 2020.

85.     The Tchefuncte River runs to the immediate east of the Timber Branch II tract; this section of the Tchefuncte is known locally as the Little Tchefuncte River.

86.     The Little Tchefuncte River is designated by the State of Louisiana as a Scenic Stream and an Outstanding Natural Resource Water.

87.     The Little Tchefuncte is highly popular in the area for recreational uses, such as wading, swimming, kayaking, and boating.

88.     The Timber Branch, which is a tributary to the Tchefuncte, runs immediately south of the proposed Timber Branch II site.

89.     The 24.58 acres of wetlands at issue in the Timber Branch II project are adjacent to the Tchefuncte River and its tributary, the Timber Branch.

90.     The Timber Branch II site is in the Liberty Bayou-Tchefuncta watershed.

91.     The Timber Branch II site's tree canopy helps to intercept rain during storm events, before the rain can reach the soil and become runoff. This canopy extends to almost all of the 69.19 total project acreage under the scope of consideration. The Project will eliminate much of this canopy and replace it with impermeable concrete.

92.     The Timber Branch II site's wetlands help to absorb runoff during storm events. The Project will eliminate what is largely permeable wetlands and replace them with impermeable concrete.

93.     Evidence in the record reflects that the Timber Branch II project will lead to faster runoff during storm events, an increased risk of flooding in the area, and erosion and scouring of the banks and bed of the Timber Branch and the Little Tchefuncte River.

94.     The Federal Emergency Management Administration (FEMA) has classified a portion of the Timber Branch II site as "flood zone AE," a high-risk repetitive flood zone area.

95.     The Little Tchefuncte River in the immediate vicinity of the Project site flooded severely in 2016 when heavy rainfall caused it to overflow.

96.     The Applicant owns the entire 200-acre tract within which Timber Branch II would be sited.

97.     On March 19, 2018, the Corps posted a link on its webpage to a public notice of the permit application for the Timber Branch II project.

98.     The Corps' public notice of the Timber Branch II application consisted of three pages of mostly boilerplate language and an attached set of application drawings.

99.     The public notice drawings of Timber Branch II indicate that all structures will be slab on grade.

100.     The drawings attached to the Timber Branch II public notice inaccurately portrayed the extent of paving for the Project, reflecting only paving from roads and walkways and not from the concrete slab used as foundation for the building structures.

101.     In the Timber Branch II public notice, the Corps included no information on alternatives or details on the mitigation for the Timber Branch II project.

102.     Loretto O'Reilly, Healthy Gulf, the Louisiana Audubon Council, and the Sierra Club, Delta Chapter submitted written comments to the Corps on the Timber Branch II project (collectively, "Commenters").

103.     In their Timber Branch II comments, Commenters raised numerous concerns, including the project's destruction of permeable wetlands and the flooding of nearby areas that would result.

104.     Commenters detailed the flooding that is already a serious problem in the area, including the flooding that occurred in March and August of 2016.

105.     Commenters discussed the significant impacts from the cumulative loss of hundreds of acres of wetlands in the area as a result of past, present, and reasonably foreseeable future Corps permitting, including the Timber Branch II permitting, and stated that the Corps must conduct a cumulative impacts analysis.

106.     Commenters objected to the significant adverse impacts the Timber Branch II project would individually and cumulatively pose on local wildlife populations – including threatened and endangered species – and their habitats; water quality; the aesthetic value of the natural environment; and traffic.

107.    Evidence in the record establishes that the Project would eliminate habitat for local wildlife including reptiles, birds, and mammals. These include coyotes, bobcats, armadillos, raccoons, possums, beavers, turtles, and deer; a variety of birds including herons, ducks, egrets, bald eagles and owls; and various aquatic creatures.

108.    Should the Project go forward, many of these animals will be severely impacted through habitat loss.

109.    Long-term impacts from the Timber Branch II project include loss of flood protection and harm to local wildlife and ecosystems, water quality, and aesthetic and recreational values to local residents.

110.    Commenters also noted the high density of development in the Timber Branch II project area.

111.    Commenters cited significant indirect impacts that Timber Branch II would have on the area, resulting in increased vehicular traffic, noise pollution, light pollution, and a degradation of air quality.

112.    Commenters raised concerns regarding the Timber Branch II Applicant's plan to develop the entire 200-acre tract of land on which Timber Branch II would be sited and submitted testimonial evidence of that plan.

113.    In his response to comments, the Applicant did not contradict the commenters' evidence that he plans to develop the entire 200-acre tract of land.

114.    In May 2021, the Applicant presented plans to St. Tammany Parish to develop the entire 200-acre Timber Branch II site and requested rezoning approval for portions of that site.

115.    Outside of the 69.19-acre Timber Branch II portion, a large percentage of the remainder of the 200-acre Timber Branch II site is wetlands.

116.     On November 3, 2020, the Corps approved the Section 404 permit for the Timber Branch II project, permitting the dredge and fill of a total of 69.19 forested acres, 24.58 acres of which is wetlands.

117.     The Corps issued the Timber Branch II permit based on an expired jurisdictional determination.

118.     The Corps completed its NEPA analysis of the Timber Branch II project prior to September 14, 2020.

119.     The Corps applied the 2019 version of the CEQ Regulations in its NEPA analysis of the Timber Branch II project.

120.     In its documentation of its decision to issue the Timber Branch II permit ("TBII decision document"), the Corps did not consider the impacts of the loss of the Project area's wetlands on flooding in the area beyond checking a box for "negligible" next to flood hazard and floodplain values.

121.     In its TBII decision document, the Corps failed to address the project's location in a high-risk flood area.

122.     In its TBII decision document, the Corps did not address the issue of the Applicant's future development of the rest of the tract on which Timber Branch II is sited.

123.     In its TBII decision document, the Corps did not address the impacts of the many permits it has issued in the past to fill in wetlands in the Timber Branch II area of St. Tammany Parish.

124.     The Corps has records of all the projects it has permitted within three miles of these sites and of all the projects it has permitted in this watershed.

125.     The Corps did not consider the impacts of the Ochsner Blvd. Extension project when it permitted the Timber Branch II project.

126.     Despite its finding that cumulatively, similar projects could have a long-term impact on the aquatic ecosystem, the Corps conducted no cumulative impacts analysis of the effects of past, present, or reasonably foreseeable future fill projects when it issued the Timber Branch II permit.

127.     In its TBII decision document, the Corps recognized that secondary effects would include but not be limited to noise, safety, traffic, and aesthetics.

128.     The Corps conducted no analysis of the impacts of the Timber Branch II project on noise, safety, traffic, or aesthetics and had no basis for its checkbox finding that these impacts would be minor.

129.     The Timber Branch II Project is not water dependent.

130.     In the TBII decision document, the Corps failed to apply a presumption that practicable alternatives other than special aquatic sites exist and have less impact on the environment.

131.     Although the Corps determined that the Timber Branch II project is surrounded by commercial and residential development, in its TBII decision document it failed to provide meaningful justification concerning the need for more development in the area.

132.     The record does not establish the need for the Timber Branch II project in such a limited geographic area as "west St. Tammany Parish."

133.     In its TBII decision document, the Corps confined its evaluation of off-site practicable alternatives to southwest St. Tammany Parish.

134.    In concluding that "there are no alternatives to the proposed discharge that would be less environmentally damaging," the Corps performed no independent analysis and based its conclusion on the Applicant's alternatives analysis which failed to consider a single site outside of a flood zone or the Corps' jurisdictional wetlands and with only one of the seven alternative sites even being an appropriate size for the proposed Timber Branch II project.

135.    In determining that less damaging alternatives, including the "no action alternative," were not practicable, the Corps failed to analyze or consider the adverse environmental impacts and flood risks posed by the Timber Branch II project.

136.    In determining that less damaging alternatives, including the "no action alternative," were not practicable, the Corps failed to provide analysis or reasoning to support its conclusion that the needs of the Applicant and the potential economic benefits of the Timber Branch II project exceeded the significant environmental risks, including flood risks, posed by the Project.

137.    The Corps concluded that a no-action alternative to the Timber Branch II project, while having the least impact on wetlands, was not practicable only because it "does not meet the needs of the applicant" and then cited the Applicant's potential "loss of anticipated revenue" as the sole negative impact of a no-action alternative.

138.    The Corps failed to provide analysis or reasoning for its determination that the adverse impacts resulting from the Timber Branch II project are not significant.

139.    The Corps failed to provide analysis or reasoning for its determination that the cumulative impacts of the Timber Branch II project are not significant.

140.    The Corps determined that compensatory mitigation would be required to offset the Timber Branch II project's incremental contribution to cumulative effects.

141.    During the permit application review, the Corps sent the Applicant a list of approved mitigation banks. The list did not include the Waldheim Mitigation Bank.

142.    Upon information and belief, proper Corps procedures were not followed before the Applicant received credit from the Waldheim Mitigation Bank.

143.    The Applicant has an ownership interest in the Waldheim Mitigation Bank.

144.    The Corps approved the Applicant's purchase of 58.4 acres in the Waldheim Mitigation Bank as compensatory mitigation for the impacts of wetland loss at the site.

145.    The Corps failed to discuss or demonstrate how the mitigation will replace wetland functions lost as a result of the Timber Branch II project or how the mitigation will offset the Project's incremental contribution to cumulative effects.

146.    The LRAM, in general and as applied in the Timber Branch II permitting, does not serve to explain or justify how the mitigation will replace lost wetland functions at the Timber Branch II project site.

147.    The Corps failed to sufficiently analyze the Timber Branch II project's probable or cumulative impacts on the public interest factors of conservation, aesthetics, general environmental concerns, wetlands, flood hazards, floodplain values, water supply and conservation, water quality, safety, considerations of property ownership, or the general needs and welfare of the people.

### *Ochsner Blvd. Extension Road Permit*

148.    On November 10, 2016, the St. Tammany Parish Government ("the Parish") applied for a permit to fill 31.5 forested acres of land to build a two-mile extension road between Highway 1077 and Ochsner Boulevard. Wetlands comprise 15.8 of the 31.5 acres to be filled.

149.     The Corps considered the scope of its extension road analysis under NEPA to be the 31.5 total project acreage.

150.     The Parish stated that the purpose of the Extension project was to alleviate local traffic congestion.

151.     Upon information and belief, the Parish provided no traffic study to the Corps in connection with its Extension project.

152.     The Parish's Extension project is in the Liberty Bayou-Tchefuncta watershed.

153.     The tree canopy on the 31.5-acre Extension Road site helps to intercept rain during storm events, before the rain can reach the soil and become runoff. The Parish's Extension project will eliminate much of this canopy and replace it with impermeable concrete.

154.     The Extension project site's wetlands help to absorb runoff during storm events. The Extension project will eliminate what is largely permeable wetlands and replace them with impermeable concrete.

155.     The wetlands that the Parish proposes to fill for the Extension project feed Flower Bayou, a natural and scenic river.

156.     The Timber Branch runs near the Extension project.

157.     The Extension project is located in a high-risk flood area of St. Tammany Parish.

158.     On January 23, 2017, the Corps posted a link on its webpage to a public notice for comment on the Ochsner Blvd. Extension project.

159.     On February 13, 2017, the Environmental Protection Agency (EPA) commented on the Ochsner Blvd. Extension project. The EPA expressed concern with the potential direct, indirect, and cumulative impacts of the Extension project.

160.     In its comments, EPA discussed "the tremendous decline in Louisiana" of wetlands like those the Extension project would impact. It detailed the values of the wetlands to be destroyed for the Extension project, including wildlife habitat, removal of pollutants from the water, and floodwater storage.

161.     In its comment, EPA specifically stated that the loss of wetland functions and increase in impervious surfaces resulting from the Extension project could lead to increased flooding in the area.

162.     EPA recommended "that a Department of the Army Permit not be issued for this activity until the applicant demonstrates the need for the project and its location within a wetland area, and provides a full evaluation of less environmentally damaging alternatives."

163.     The Louisiana Department of Wildlife and Fisheries (LDWF) also commented on the extension project, on January 31, 2017. It stated: "The applicant is proposing to construct a roadway through some of the last remaining forested wetlands feeding Flower Bayou, a Louisiana designated Natural and Scenic River."

164.     LDWF also noted that the Extension project would undoubtedly lead to further development within the wetlands.

165.     LDWF requested a justification and alternative sites analysis for the Extension project to "clearly show if there is a real need to locate this activity within wetlands."

166.     The Parish did not provide a full evaluation of less damaging alternatives or clearly show a real need to locate the Extension project in wetlands, instead providing minimal information consisting of conclusory statements unsupported by evidence.

167.    From approximately February 2017 to May 2018 and May 2018 to June 2020 there was no activity before the Corps on the Parish's application for the Ochsner Blvd. Extension Road.

168.    In January 2020 members of Plaintiff Coalition for Responsible Zoning (CFRZ) met with Michael Farabee of the Corps to discuss various pending permit applications for St. Tammany Parish projects, including the Extension Road project. CFRZ members requested that the Extension Road impacts be considered cumulatively with impacts from another pending project for the Nord du Lac Business Park.

169.    At the January 2020 meeting, Mr. Farabee informed CFRZ members that the Extension road permit had been placed in inactive status.

170.    On November 17, 2020, the Corps approved the Section 404 permit for the Ochsner Blvd. Extension project, permitting the dredge and fill of a total of 31.5 forested acres of land, 15.8 acres of which are wetlands.

171.    Upon information and belief, the Corps did not issue any additional public notice on the Extension project after the original January 23, 2017, public notice.

172.    The Corps completed its NEPA analysis of the Ochsner Blvd. Extension project prior to September 14, 2020.

173.    The Corps applied the 2019 version of the CEQ Regulations in its NEPA analysis of the Ochsner Blvd. Extension project.

174.    In its documentation of its decision to issue the Ochsner Blvd. Extension permit ("Extension Road decision document"), the Corps did not consider the impacts of the loss of the project area's wetlands on flooding in the area beyond checking a box for "negligible" next to flood hazard and floodplain values.

175.    In its Extension Road decision document, the Corps failed to address the project's location in a high-risk flood area.

176.    In its Extension Road decision document, the Corps did not respond in any meaningful way to the EPA and LDWF comments, merely providing a one-sentence reference to the Parish's inadequate response.

177.    In its Extension Road decision document, the Corps did not address the numerous final and pending Corps permit actions to fill in wetlands in the Extension Road area of St. Tammany Parish.

178.    Among the permit actions before the Corps in the immediate vicinity of the Extension Road project is the Nord du Lac business park, MVN 2012-1961-EBB, a proposed 67.47-acre site containing 46.23 acres of jurisdictional wetlands, 37.97 acres of which will be impacted, originally publicly noticed by the Corps on July 1, 2019.

179.    The Corps did not consider the effects of the proposed Nord du Lac business park project when it permitted the Extension Road.

180.    The Corps did not consider the impacts of the Timber Branch II project when it permitted the Extension Road.

181.    Despite its finding that cumulatively, similar projects as well as new development off of the new roadway could have a long-term impact on the aquatic ecosystem, the Corps conducted no cumulative impacts analysis of the effects of past, present, or reasonably foreseeable future fill projects when it issued the Ochsner Blvd. Extension Road permit.

182.    In its Extension Road decision document, the Corps recognized that secondary effects would include but not be limited to noise, safety, traffic, and aesthetics.

183.    The Corps conducted no analysis of the impacts of the Extension Road project on noise, safety, traffic, or aesthetics and had no basis for its checkbox finding that these impacts would be minor.

184.    The Ochsner Blvd. Extension Project is not water dependent.

185.    In the Extension Road decision document, the Corps failed to apply a presumption that practicable alternatives other than special aquatic sites exist and have less impact on the environment.

186.    In determining that less damaging alternatives, including the "no action alternative," were not practicable, the Corps failed to analyze or consider the adverse environmental impacts and flood risks posed by the Extension Road Project.

187.    In determining that less damaging alternatives, including the "no action alternative," were not practicable, the Corps failed to analyze or consider the multimillion dollar St. Tammany Parish project to improve Highway 1085.

188.    The Corps determined that compensatory mitigation would be required to offset the Extension Road's incremental contribution to cumulative effects.

189.    The Corps approved the Parish's purchase of 40.6 acres in the Cane Bayou Mitigation Bank as compensatory mitigation for the impacts of wetland loss at the site.

190.    The Corps failed to discuss or demonstrate how the mitigation will replace wetland functions lost as a result of the Extension Road project or how the mitigation will offset the project's incremental contribution to cumulative effects.

191.    The LRAM, in general and as applied in the Extension Road permitting, does not serve to explain or justify how the mitigation will replace lost wetland functions at the Ochsner Blvd. Extension project site.

192.     The Timber Branch II site and the Ochsner Blvd. Extension site are within approximately one mile of each other.

***Related Facts***

193.     Between 2001 and 2011, the Liberty Bayou-Tchefuncta watershed has experienced an increase in impervious surface percentage of 13%, meaning 2742 acres were converted to impervious surface.

194.     Flooding of homes and businesses in the Liberty Bayou-Tchefuncta watershed during the March 2016 flooding resulted in nearly $50 million in flood insurance claims.

195.     There are over one thousand repetitive flood loss properties in the unincorporated portions of St. Tammany Parish in the Liberty Bayou-Tchefuncta watershed.

196.     At least seven residential developments are located within one mile of the projects. Many residents of these developments have had their homes flooded in recent years, including during the March 2016 and May 2020 floods.

197.     The Corps did not consider flooding in either its decision to issue the Timber Branch II project or in its decision to issue the Ochsner Blvd. Extension project.

198.     The Corps conducted no cumulative impacts analysis of the effects of past, present, or reasonably foreseeable future fill projects when it issued the Ochsner Blvd. Extension project permit.

**<u>First Cause of Action</u>**

*NEPA: Failure to Complete an Adequate Environmental Assessment*

199.     Plaintiffs hereby incorporate by reference paragraphs 1 through 198.

200.     The Corps' Environmental Assessments on the Timber Branch II project failed to provide sufficient information or analysis to support its findings that the project would not have a significant impact on the environment.

201.     The Corps' Environmental Assessments on the Ochsner Extension Road project failed to provide sufficient information or analysis to support its findings that the project would not have a significant impact on the environment.

202.     The Corps' Environmental Assessment on the Timber Branch II project failed to provide sufficient information or analysis to support its finding that no less damaging alternatives to the proposed projects were practicable.

203.     The Corps' Environmental Assessment on the Ochsner Extension Road project failed to provide sufficient information or analysis to support its finding that no less damaging alternatives to the proposed projects were practicable.

204.     The Corps' Environmental Assessment on the Timber Branch II project failed to provide sufficient information or analysis to support its finding that the required compensatory mitigation would sufficiently offset the project's incremental contributions to cumulative effects.

205.     The Corps' Environmental Assessment on the Ochsner Extension Road project failed to provide sufficient information or analysis to support its finding that the required compensatory mitigation would sufficiently offset the project's incremental contributions to cumulative effects.

206.     The Corps acted arbitrarily and capriciously and violated the National Environmental Policy Act when it failed to prepare an adequate Environmental Assessment for the Timber Branch II and Ochsner Extension Road projects.

**Second Cause of Action**

*NEPA: Failure to Complete an Environmental Impact Statement*

207.    Plaintiffs hereby incorporate by reference paragraphs 1 through 206.

208.    The Corps' issuances of the Section 404 permits for the Timber Branch II and Ochsner Extension Road projects were major federal actions as defined under NEPA.

209.    The Timber Branch II project when considered in light of past, present, and reasonably foreseeable future projects will have a significant impact on the environment.

210.    The Ochsner Extension Road project when considered in light of past, present, and reasonably foreseeable future projects will have a significant impact on the environment.

211.    The Corps' failure to prepare an Environmental Impact Statement before it issued the Section 404 permit for the Timber Branch II project violates NEPA. 42 U.S.C.§ 4332(C).

212.    The Corps' failure to prepare an Environmental Impact Statement before it issued the Section 404 permit for the Ochsner Extension Road project violates NEPA. 42 U.S.C.§ 4332(C).

**Third Cause of Action**

*NEPA: Failure to Consider Environmental Impacts*

213.    Plaintiffs hereby incorporate by reference paragraphs 1 through 212.

214.    The Corps failed to adequately consider the impacts of the Timber Branch II project.

215.    The Corps failed to adequately consider the impacts of the Ochsner Extension Road project.

216.    The Corps failed to consider the cumulative effects of the Timber Branch II project in light of past, present and reasonably foreseeable actions.

31

217.    The Corps failed to consider the cumulative effects of the Ochsner Extension Road project in light of past, present, and reasonably foreseeable future actions.

218.    The Corps must conduct a cumulative impact analysis of the impacts of the Timber Branch II project in light of past, present, and reasonably foreseeable future actions in order to support a finding that the project will not have a significant impact on the environment.

219.    The Corps must conduct a cumulative impact analysis of the impacts of the Ochsner Extension Road project in light of past, present, and reasonably foreseeable future actions in order to support a finding that the project will not have a significant impact on the environment.

220.    The Corps' failure to consider the cumulative effects of the Timber Branch II project, Ochsner Extension Road project, and related projects violates NEPA. 42 U.S.C.§ 4332.

### Fourth Cause of Action

*Clean Water Act Violations*

221.    Plaintiffs hereby incorporate by reference paragraphs 1 through 220.

222.    The Corps' issuance of the Timber Branch II permit violates the Clean Water Act and the mandatory Guidelines issued by the EPA for avoiding destruction of wetlands.

223.    The Corps' issuance of the Ochsner Extension Road permit violates the Clean Water Act and the mandatory Guidelines issued by the EPA for avoiding destruction of wetlands.

224.    The Corps' failure to adequately consider practicable alternatives which would have less adverse impact than the Timber Branch II project violates the Clean Water Act and is arbitrary and capricious.

225.    The Corps' failure to adequately consider practicable alternatives which would have less adverse impact than the Ochsner Extension Road project violates the Clean Water Act and is arbitrary and capricious.

226.    The Corps' failure to apply the presumption mandated by the Section 404(b)(1) Guidelines that practicable alternatives exist other than the special aquatic sites in the Timber Branch II project violates the Clean Water Act and is arbitrary and capricious.

227.    The Corps' failure to apply the presumption mandated by the Section 404(b)(1) Guidelines that practicable alternatives exist other than the special aquatic sites in the Ochsner Extension Road project violates the Clean Water Act and is arbitrary and capricious.

228.    The Corps' failure to apply the presumption that practicable alternatives other than special aquatic sites have less adverse impact on the environment when it issued the Timber Branch II permit violates the Guidelines and is arbitrary and capricious.

229.    The Corps' failure to apply the presumption that practicable alternatives other than special aquatic sites have less adverse impact on the environment when it issued the Ochsner Extension Road permit violates the Guidelines and is arbitrary and capricious.

230.    The Corps' required mitigation on the Timber Branch II project fails to adequately ensure that "no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. § 230.10(d) (2020).

231.    The Corps' required mitigation on the Ochsner Extension Road project fails to adequately ensure that "no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. § 230.10(d) (2020).

232.    The Corps' required mitigation on the Timber Branch II project fails to offset the environmental losses resulting from unavoidable impacts to the affected wetlands and does not compensate for the aquatic resource functions that will be lost as a result of the permitted activity.

233.    The Corps' required mitigation on the Ochsner Extension Road project fails to offset the environmental losses resulting from unavoidable impacts to the affected wetlands and does not compensate for the aquatic resource functions that will be lost as a result of the permitted activity.

234.    The Corps arbitrarily and capriciously approved the compensatory mitigation on the Timber Branch II permit.

235.    The Corps arbitrarily and capriciously approved the compensatory mitigation on the Ochsner Blvd. Extension Road permit.

236.    The Corps' determination that the Timber Branch II project is not contrary to the public interest lacks sufficient analysis or support.

237.    The Corps' determination that the Ochsner Extension Road project is not contrary to the public interest lacks sufficient analysis or support.

238.    The Corps did not comply with its own regulations in issuing the Timber Branch II permit.

239.    The Corps did not comply with its own regulations in issuing the Ochsner Extension Road permit.

240.    The Corps' decision to issue the Timber Branch II permit failed to give full consideration and appropriate weight to the comments submitted in response to the applicant's proposal. 33 C.F.R. § 320.4(a)(3) (2020).

241.    The Corps' decisions to issue the Ochsner Extension Road permit failed to give full consideration and appropriate weight to the comments submitted in response to the Parish's proposal. 33 C.F.R. § 320.4(a)(3) (2020).

242.    The Corps' determinations that the requirements of the Clean Water Act were met for the Timber Branch II permit was arbitrary and capricious because it based the conclusion on an expired jurisdictional determination.

## Prayer for Relief

WHEREFORE, Plaintiffs respectfully pray for judgment as follows:

A.    An order enjoining the Corps' Section 404 permits for the Timber Branch II and Ochsner Blvd. Extension projects until the Corps conducts a cumulative impacts analysis of the effects of the projects in light of past, present, and reasonably foreseeable future related actions;

B.    An order enjoining the Corps' Section 404 permits for the Timber Branch II and Ochsner Blvd. Extension projects until the Corps complies with the National Environmental Policy Act and the Clean Water Act;

C.    A declaration that the Corps violated the National Environmental Policy Act by performing an inadequate Environmental Assessment on the impacts of and alternatives to the Timber Branch II and Ochsner Blvd. Extension Road projects;

D.    A declaration that the Corps violated NEPA by failing to adequately address the impacts the projects will have on the environment.

E.    A declaration that the Corps violated the Clean Water Act by not satisfying the mandatory guidelines issued by the EPA for avoiding significant degradation of wetlands.

E.    An award for expenses and attorney fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and any other applicable laws;

F.      An award of such other relief as the Court deems just and proper.


Respectfully submitted this 27th day of May, 2021

TULANE ENVIRONMENTAL LAW CLINIC

/s/ Lisa Jordan
Lisa W. Jordan, La. Bar No. 20451 (T.A.)
Devin Lowell, La. Bar No. 36555
Tulane Environmental Law Clinic
6329 Freret Street, Suite 130
New Orleans, LA  70118
Phone: (504) 865-5789
Fax: (504) 862-8721
Email: lwjordan@tulane.edu
Email: dlowell@tulane.edu

*Counsel for Plaintiffs*