UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LORETTO O'REILLY, JR., ET AL.                CIVIL ACTION

VERSUS                                        NO: 21-1027

UNITED STATES ARMY CORPS OF                   SECTION: "A" (5)
ENGINEERS, ET AL.

<u>**ORDER AND REASONS**</u>

The following motions are before the Court: **Motion for Summary Judgment (Rec. Doc. 41)** filed by the plaintiffs, Loretto O'Reilly, Healthy Gulf, Coalition for Responsible Zoning, and the Sierra Club and its Delta Chapter ("Plaintiffs"); **Cross Motion for Summary Judgment (Rec. Doc. 89)** filed by All State Financial Co. ("All State"); **Cross Motion for Summary Judgment (Rec. Doc. 91)** filed by the United States Army Corps of Engineers and Lt. General Scott A. Spellmon (collectively and singularly "the Corps"). All motions are opposed. The motions, submitted for consideration on May 11, 2022, are before the Court on the briefs without oral argument.

This civil action is a challenge to the Corps' approval of two dredge and fill permits issued under Section 404 of the Clean Water Act, for the destruction and paving-in of a total of 40 acres of forested wetlands near Covington, St. Tammany Parish, Louisiana. (Rec. Doc. 1, Complaint at 1).

Judicial review of final agency action is conducted under the auspices of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. Plaintiffs allege that the Corps violated both the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321,

*et seq.*, and the Clean Water Act ("CWA"), 33 U.S.C. § 1251, *et seq.*, when it issued the permits.

The two permits at issue in this action are the Timber Branch II permit (MVN-2018-0215-EPP), which was obtained by All State, and the Ochsner Blvd. Extension Road permit (MVN-2017-00075-EPP) ("the Ochsner permit"), which was obtained by St. Tammany Parish ("the Parish"). Plaintiffs seek to have both permits enjoined for violations of both the CWA and NEPA and remanded to the Corps for compliance with those governing laws.[1]

Thus far in the litigation the Court has addressed emergency and preliminary injunctive relief pertaining to the Ochsner permit only. (Rec. Doc. 63, Order and Reasons denying TRO); (Rec. Doc. 84, Order and Reasons denying PI). Work pursuant to that permit was underway and progressing when this action was filed. Construction under the Timber Branch II permit issued to All State was not imminent when the case was filed.

## I.    BACKGROUND

On February 6, 2018, Bruce Wainer of All State applied to the Corps for a Section 404 wetlands fill permit to create the Timber Branch II subdivision, a proposed multi-use commercial and residential development in unincorporated St. Tammany Parish southwest of Covington, Louisiana. (Complaint ¶ 80); (TB-AR0942, 0956). The total project acreage of Timber Branch II as described in the application is 69.19

---

[1] All State was allowed to join the litigation as an intervenor. Plaintiffs argued that All State's intervention should be limited to the Timber Branch II permit, (Rec. Doc. 17, Opposition), but the magistrate judge allowed the intervention as to both permits. (Rec. Doc. 26, Order). The Parish was allowed to intervene without opposition. (Rec. Doc. 32, Order).

forested acres; wetlands comprise 24.58 of those acres. Wainer owns the entire 200-acre tract within which Timber Branch II would be sited. (Complaint ¶ 96).

The (Little) Tchefuncte River runs to the immediate east of the Timber Branch II tract. (*Id.* ¶ 85). The Timber Branch, which is a tributary to the Tchefuncte, runs immediately south of the proposed Timber Branch II site. (*Id.* ¶ 88). The 24.58 acres of wetlands at issue in the Timber Branch II project are adjacent to the Tchefuncte River and its tributary, the Timber Branch. (*Id.* ¶ 89).

On November 3, 2020, the Corps approved the Section 404 permit for the Timber Branch II development. (*Id.* ¶ 116); (TB-AR0002). Along with the permit, the Corps issued a Memorandum for Record ("MOR"), which is the decision document supporting the Corps' decision to issue the permit. (TB-AR0021). The Corps determined that a full Environmental Impact Statement was not required. Plaintiffs contend that this permit is substantially similar to the fill project called Timber Branch I whose 404 permit the Court enjoined in 2003, involving the same tract of land. *See O'Reilly v. United States Army Corps of Engr's*, No. 04-940, 2004 WL 1794531 (E.D. La. Aug. 10, 2004), *affirmed in part and reversed in part*, 477 F.3d 225 (5th Cir. 2007).

Plaintiffs allege that the Timber Branch II site's wetlands help to absorb runoff during storm events and replacing those wetlands with impermeable concrete is going to exacerbate the already serious flooding problem in the area. (*Id.* ¶¶ 91-104). Moreover, development of the Timber Branch II site would result in habitat loss for a litany of local wildlife. (*Id.* ¶¶ 107-08). But even beyond Timber Branch II, Plaintiffs allege that the owner of the tract has plans to develop the entire 200-acre site because he has recently requested a rezoning approval from the Parish for portions of the site;

and a large percentage of the remainder of the 200-acre Timber Branch II site is wetlands. (*Id.* ¶¶ 113-115).

On November 10, 2016, the Parish applied for a permit to fill 31.5 forested acres of land to build a two-mile extension road between Highway 1077 and Ochsner Boulevard in order to alleviate local traffic congestion. (AR0146). Wetlands comprise 15.8 of the 31.5 acres to be filled. (Complaint ¶ 148).

During the public notice period, Plaintiffs did not comment upon or object to the requested permit. Representatives of the plaintiff organizations did meet, however, with the Corps to voice their concerns about the proposed road. In fact, no one formally opposed the Ochsner permit. Both the Environmental Protection Agency (EPA) and the Louisiana Department of Wildlife and Fisheries commented on the project, expressing their concerns. (AR0124; AR0127). But it would be a mischaracterization of their submissions to call them "opposition" to the project. Those agencies' recommendations were essentially what federal law would require the Corps to consider anyway. The Louisiana Department of Environmental Quality later issued a Water Quality Certification for the project. (AR0121).

The Supplemental Administrative Record demonstrates that the Corps questioned the Parish about various aspects of the Ochsner permit application and the decision to locate the extension in the chosen area. (Rec. Doc. 59).

On November 17, 2020, the Corps approved the Section 404 permit for the Ochsner Blvd. Extension project. (AR0001). Along with the permit, the Corps issued a Memorandum for Record ("MOR"), which is the decision document supporting the

Corps' decision to issue the permit. (AR0014). The Corps determined that a full Environmental Impact Statement was not required.

The Parish began the public bid process for the construction of the Ochsner extension road in May and June 2021. The contract was awarded to Magee Excavation & Development, LLC on October 13, 2021, and Magee received its notice to proceed from the Parish on November 4, 2021. (Rec. Doc. 61-2, Affidavit). The preparatory work on the site of the project began not long after.

Plaintiffs complain that the Timber Branch II and Ochsner Blvd. Extension Road permits are only two of dozens of Section 404 permits that the Corps has issued in rapidly-developing west St. Tammany Parish, which have collectively eliminated hundreds of acres of flood-absorbing wetlands and replaced them with impermeable concrete. (Complaint ¶ 2). Primary among Plaintiffs' concerns (which include loss of wildlife habitat, traffic and noise problems, and diminution of water quality) is that one of the most critical functions of wetlands is their capacity to absorb floodwaters, and according to Plaintiffs, flooding has reached epic proportions in the region. (*Id.* at 1). At the risk of oversimplifying Plaintiffs' challenge to the Corps' decision to issue the Timber Branch II and Ochsner permits—because Plaintiffs do challenge the permits on numerous grounds—the crux of Plaintiffs' complaint is that the Corps took a myopic view with respect to each permit without considering the detrimental cumulative impacts that these two additional permits would contribute to in light of all of the other permits issued in that region.

Plaintiffs filed their complaint for declaratory and injunctive relief on May 27, 2021. The administrative record was lodged on November 15, 2021, (Rec. Doc. 36),

and supplemented on January 10, 2022, (Rec. Doc. 59). On November 22, 2021,

Plaintiffs moved for leave to file a motion for summary judgment pertaining to both

permits that exceeded the page limits imposed by the Local Rules. (Rec. Doc. 38). The

Court granted that motion but rather than have the motion for summary judgment

submitted on the December 8, 2021 date requested by Plaintiffs, a date which would

have required the oppositions to be filed immediately after the Thanksgiving holiday

weekend, the Court set the motion for submission on January 19, 2022. (Rec. Doc. 40,

Order).

The Corps and the intervenors sought to adjust the briefing schedule which then

prompted Plaintiffs' to file their first motion for a temporary restraining order ("TRO").[2]

(Rec. Doc. 48, Motion). On the same day that they moved for a TRO, Plaintiffs filed a

motion for preliminary injunctive relief. (Rec. Doc. 49, Motion for Preliminary Injunction).

In light of the flurry of motions being filed, including those for emergency relief, the Court

held a telephone status conference on December 15, 2021. (Rec. Doc. 54, Minute

Entry). The parties proposed various approaches to structuring the motion practice in

this case and the Court urged all parties to reach an agreement. The parties reached

much common ground as to scheduling but days later Plaintiffs filed their amended

motion for a temporary restraining order. (Rec. Doc. 55, Motion). The Court then issued

its own briefing schedule. (Rec. Doc. 57, Order).

---

[2] The first motion for a temporary restraining order was filed as an ex parte/consent motion with
no notice of submission but the Court instructed the Clerk to accept the deficient motion. The
Court dismissed that motion as moot (Rec. Doc. 57, Order), after Plaintiffs filed their amended
motion for a TRO.

On January 13, 2022, the Court denied the motion for a temporary restraining order as to the Ochsner permit, explaining that the question whether the work at issue should be enjoined pending a decision on the merits should be decided on Plaintiffs' motion for a preliminary injunction. (Rec. Doc. 63, Order and Reasons at 6). Because the motion for a preliminary injunction would be submitted relatively soon and expeditiously addressed, and because the work taking place at the time pursuant to the Ochsner permit was preparatory in nature, a TRO was not necessary.[3] (*Id.*).

On February 18, 2022, the Court entered its Order and Reasons denying the motion for a preliminary injunction as to the Ochsner permit. (Rec. Doc. 84, Order and Reasons). As of the time that the briefing was complete as to that permit, the Parish had already spent over $4,000,000.00 in public funds on the Ochsner Blvd. Extension Road project. (Rec. Doc. 61-1, Long affidavit). The Court explained why Plaintiffs had not demonstrated a substantial likelihood of success on the merits as to the Ochsner permit claim.[4] (Rec. Doc. 84, Order and Reasons at 12-14).

The parties' respective motions for summary judgment on the merits as to both the Ochsner permit and the Timber Branch II permit are now ripe for decision.

---

[3] In their motion for a temporary restraining order, the Plaintiffs had limited their arguments to a single issue, the alternatives analysis, *i.e.*, that the Corps failed to adequately address alternatives that avoid the destruction of wetlands. The Court did not address whether Plaintiffs had satisfied the substantial likelihood of success on the merits prong as to alternatives because the Court was persuaded that other aspects of the case militated against issuing a TRO pending the preliminary injunction hearing.

[4] Plaintiffs point out that during the proceedings for emergency and preliminary injunctive relief regarding the Ochsner permit, they presented to the Court only a portion of their case and the applicable law. (Rec. Doc. 93, Opposition at 4 n.2). Therefore, the denial of preliminary relief does not mean that they cannot prevail nonetheless on the merits.

II.    **DISCUSSION**

***Governing Law***

The Court's review of the Corps' decision to issue the challenged permits is subject to the APA's "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" standard. *City of Shoreacres v. Waterworth*, 420 F.3d 440, 445 (5th Cir. 2005) (quoting 5 U.S.C. § 706(2)(A); *Shell Offshore v. Babbitt*, 238 F.3d 622, 627 (5th Cir. 2001)). This is a demanding standard. *Atchafalaya Basinkeeper v. United States Army Corps of Eng'rs*, 894 F.3d 692, 697 (5th Cir. 2018). The standard of review is a deferential one, regardless of whether the Corps' decision is challenged under the CWA or NEPA or both. *Id.* at 445. The Court is not permitted to conduct a de novo review of the permitting decision and ultimately substitute its own determination for that of the Corps'. *Town of Abita Springs v. United States Army Corps of Engr's*, 153 F. Supp. 3d 894, 921 (E.D. La. 2015) (citing *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904 (5th Cir. 1983)). The Court must simply review the Corps' decision, as supported by the administrative record, and affirm it (even if the Court disagrees) unless it is arbitrary or capricious. *Id.* (citing *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976)).

Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Atchafalaya Basinkeeper*, 894 F.3d at 697 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). In reviewing that explanation, the court must "consider whether the decision was based on

a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.*

Ordinarily, an arbitrary and capricious decision is one in which the agency has relied on factors which Congress had not intended it to consider, or one in which the agency entirely failed to consider an important aspect of the problem, or one in which the agency offered an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[5] *Fath v. Tex. Dept. of Trans.*, 924 F.3d 132, 136 (5th Cir. 2018) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. 29 at 43).

The Corps' permitting decision must comply with both the CWA and NEPA.[6] *O'Reilly*, 477 F.3d at 229 n.1 (citing *Sierra Club v. Sigler*, 695 F.2d 957, 967 (5th Cir. 1983)). Unlike the CWA, which has substantive environmental goals, NEPA imposes procedural requirements on federal agencies requiring them to consider and analyze the environmental impact of their actions. *City of Shoreacres*, 420 F.3d at 450 (citing *Robertson v. Methow Valley Citizens Council*, 109 S. Ct. 1835, 1846 (1989)); *O'Reilly*, 477 F.3d at 228 (quoting *Coliseum Square Ass'n, Inc. v. Jackson*, 455 F.3d 215, 224 (5th Cir. 2006)). Most notably, it is NEPA that directs federal agencies to prepare an Environmental Impact Statement ("EIS") for "major Federal actions *significantly* affecting

---

[5] Importantly, review within the proper administrative framework is based on the agency's administrative record as a whole and not just the four corners of the EA. *See Atchafalaya Basin Keeper*, 894 F.3d at 700.

[6] No one has questioned the applicability of both bodies of law to the permit at issue—the CWA, because the permits will involve the discharge of dredged or fill material into wetlands, *see City of Shoreacres*, 420 F.3d at 446 n.2 (citing 33 U.S.C.§ 1344(a); 33 C.F.R. § 328.3(a)(2)), the regulation of which has been delegated by Congress to the Corps, *Avoyelles Sportsmen's League*, 715 F.2d at 911 (citing 33 U.S.C. §§ 1344, 419), and NEPA, because permitting the Ochsner extension road and the Timber Branch II development constitutes "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(C).

the quality of the human environment," except in certain qualifying situations.[7] *O'Reilly*,

477 F.3d at 228 (citing 42 U.S.C. § 4332(2) (emphasis added); *Sabine River Auth. v.*

*U.S. Dept. of Interior*, 951 F.2d 669, 676 (5th Cir. 1992)). An Environmental Assessment

("EA") is a "concise" public document prepared by the federal agency to "briefly" provide

sufficient evidence and analysis for determining whether to prepare an EIS or issue a

Finding of No Significant Impact ("FONSI"). 40 C.F.R. § 1508.9(a)(1). An EA shall

include brief discussions of the anticipated environmental impacts of the proposed

action and alternatives. *Id.* § 1508.9(b). An EA is intended to be a brief and concise

document, normally not exceeding 15 pages. 33 C.F.R. § 230.10(a)-(c). But while the

EA's discussion of the required permitting factors can and should be brief, it must also

be sufficient to demonstrate "reasoned decision making" and cannot omit "a significant

environmental concern." *Fritiofson v. Alexander*, 772 F.2d 1225, 1236 (5th Cir. 1985)

(citing *Foundation on Econ. Trends v. Heckler*, 756 F.2d 143, 154 (D.C. Cir. 1985)). But

NEPA plays no role in requiring the agency to favor an environmentally preferable

course of action. *Sabine River Auth.*, 951 F.2d at 676.

      To assist federal agencies in determining whether an EIS is required pursuant to

NEPA, the Council on Environmental Quality ("CEQ") has been authorized to

promulgate guidelines in the form of regulations.[8] *O'Reilly*, 477 F.3d at 228 (citing 40

C.F.R. § 1500.3; *Coliseum Square*, 465 F.3d at 224). Federal agencies must consider

---

[7] The Council on Environmental Quality regulations applicable to the NEPA EIS determination
define "significantly" as requiring considerations of both context and intensity. 40 C.F.R. §
1508.27. The regulation lists ten factors for an agency to consider when assessing intensity. *Id.*
§ 1508.27(b).

[8] As a courtesy to the Court, Plaintiffs have included as Appendix 1 to their motion for summary
judgment a copy of the CEQ's NEPA regulations that were applicable to the permitting decisions
at issue. (Rec. Doc. 41-14). The regulations have since been revised.

the cumulative or incremental environmental impacts of their actions. "Cumulative

impact" is the impact on the environment which results from the incremental impact of

the action when added to other past, present, and reasonably foreseeable future actions

regardless of what agency or person undertakes such other actions. 40 C.F.R. §

1508.7. Cumulative impacts can result from individually minor but collectively significant

actions taking place over a period of time. *Id.* Federal agencies must take a "hard look"

at the consequences of their actions in preparing detailed studies for projects that will

significantly impact the environment and in deciding how much study is required. *Fath*,

924 F.3d at 136 (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332,

349-50 (1989)). The Corps' NEPA obligation is limited to discussing relevant factors and

explaining its decision, not to reaching conclusions in which the court concurs. *O'Reilly*,

477 F.3d at 228 (citing *Robertson v. Methow Valley Citiz. Council*, 490 U.S. 332, 350

(1989)).

      The Corps issues § 404 (of the CWA) permits under the guidance and

requirements imposed by its own regulations as well as the CWA's § 404(b)(1)

guidelines developed by the EPA. *See* 33 C.F.R. Pt. 320; 40 C.F.R. Pt. 230. The

404(b)(1) guidelines provide that the Corps must ensure that the proposed fill material

will not cause any significantly adverse effects on human health or welfare, aquatic life,

aquatic ecosystems, or recreational, aesthetic, or economic values. 40 C.F.R. §

230.10(c)(1)-(4). The 404(b)(1) guidelines prohibit a dredge and fill permit if there is a

"practicable alternative" to the proposed discharge which would have less adverse

impact on the aquatic ecosystem, so long as the alternative does not have other

significant adverse environmental consequences. 40 C.F.R. § 230.10(a). Consideration

of practicable alternatives must include the option of "not discharging into the waters of the U.S." *Id.* § 230.5(c). In cases where the proposed project is not water dependent, the 404(b)(1) guidelines mandate a presumption that practicable alternatives "that do not involve special aquatic sites" like wetlands are available "unless clearly demonstrated otherwise." *Id.* § 230.10(a)(3).

The 404(b)(1) guidelines also require examination of the cumulative effects on the aquatic ecosystem of the permitting decision. *Id.* § 230.11(g). Cumulative impacts are the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material. *Id.* § 230.11(g)(1). Although the impact of a particular discharge may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in a major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems. *Id.* The Corps' own permitting regulations provide for a "public interest" review that includes consideration of cumulative impacts. 33 C.F.R. § 320.4(a)(1).

Section 404 permits are also subject to mitigation requirements. No discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem. 40 C.F.R. § 230.10(d). The Corps' regulations (developed in cooperation with the EPA) provide standards and criteria for the use of all types of compensatory mitigation. 33 C.F.R. § 332.1(a)(1). Compensatory mitigation for unavoidable impacts may be required to ensure that an activity requiring a § 404 permit complies with the 404(b)(1) guidelines. *Id.* § 332.1(c)(3). Compensatory mitigation

means the restoration (re-establishment or rehabilitation), establishment (creation), enhancement, and/or in certain circumstances preservation of aquatic resources for the purposes of offsetting unavoidable adverse impacts which remain after all appropriate and practicable avoidance and minimization has been achieved. *Id.* § 332.2. It includes the use of a mitigation bank or an in-lieu fee program. *Id.* Mitigation bank means a site, or suite of sites, where resources (*e.g.*, wetlands, streams, riparian areas) are restored, established, enhanced, and/or preserved for the purpose of providing compensatory mitigation for impacts authorized by DA permits. *Id.*

In general, a mitigation bank sells compensatory mitigation credits to permittees whose obligation to provide compensatory mitigation is then transferred to the mitigation bank sponsor. *Id.* In general, the required compensatory mitigation should be located within the same watershed as the impact site, and should be located where it is most likely to successfully replace lost functions and services, taking into account such watershed scale features as aquatic habitat diversity, habitat connectivity, relationships to hydrologic sources (including the availability of water rights), trends in land use, ecological benefits, and compatibility with adjacent land uses. *Id.* § 332.3(b)(1).

### *Plaintiffs' Standing*

A preliminary issue in every case such as this one is whether the party bringing the lawsuit has standing. *Sabine River Auth.*, 951 F.2d at 673.

Plaintiffs contend that they have standing to challenge the permits at issue and they have provided a significant amount of briefing and evidentiary support for this contention. No party has questioned the plaintiffs' standing to challenge the permits at issue.

But standing has both constitutional and prudential limitations, *Optimus Steel, LLC v. United States Army Corps of Engr's*, 492 F. Supp. 3d 701, 715 (E.D. Tex. 2020) (citing *Bennett v. Spear*, 520 U.S. 154, 162 (1997)), the former of which enforces the Constitution's non-waivable case-or-controversy requirement, and the latter of which embodies judicially self-imposed limits on the exercise of federal jurisdiction, *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013) (citing *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004)). Although challenges to prudential standing are waivable if not raised, *Board of Miss. Levee Comm'rs v. EPA*, 674 F.3d 409, 417-18 (5th Cir. 2012), constitutional standing implicates subject matter jurisdiction and therefore is not waivable, cannot be conferred by consent, and must be considered by the Court even if not questioned by the opposing party. *See Ford v. NYLCare Health Plans*, 301 F.3d 329, 331-32 (5th Cir. 2002) (citing *SEC v. Forex Asset Mgmt., LLC*, 242 F.3d 325, 328 (5th Cir. 2001)).

Article III standing requires a plaintiff to show: "(1) an injury in fact (2) that is fairly traceable to the actions of the defendant and (3) that likely will be redressed by a favorable decision." *Cibolo Waste*, 718 F.3d at 473 (citing *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 560 (5th Cir.2001). An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Additionally, in the context of NEPA, beyond constitutional standing requirements the plaintiff must establish that the injury he complains of "falls within the 'zone of interests' sought to be protected by the statutory provision whose

violation forms the legal basis for his complaint." *Sabine River Auth.*, 951 F.2d at 675 (quoting *Lujan v. Nat'l Wildlife Feder.*, 497 U.S. 871, 883 (1990)).

The plaintiffs in this case are Loretto O'Reilly, Jr. (an individual), Healthy Gulf (a Louisiana non-profit corporation), Coalition for Responsible Zoning (a Louisiana corporation), and Sierra Club (Delta Chapter) (a non-profit organization throughout the United States with a chapter in Louisiana).

Associational standing for an organization may be established if at least one member of the organization would have standing to sue in his or her own right. *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 191 (5th Cir. 2012), *abrogated on other grounds by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) (citing *Tex. Demo. Party v. Benkiser*, 459 F.3d 582, 587-88 (5th Cir. 2006)). An individual plaintiff must show an injury in fact (concrete and particularized and actual or imminent), that is fairly traceable to the challenged action of the defendant, that is likely to be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–561 (1992)).

Mr. O'Reilly has submitted a declaration that focuses exclusively on the Timber Branch II proposal. (Rec. Doc. 41-11). The Ochsner Extension Road is mentioned twice in passing. (*Id.* ¶¶ 5, 25). This declaration does not establish that O'Reilly has suffered or will suffer an injury in fact from the Corps' granting of the Ochsner permit. O'Reilly has established, however, injury in fact and the other elements of standing as to the Timber Branch II permit.

Healthy Gulf has the burden of showing that at least one of its members has standing to challenge the permits. Healthy Gulf's executive director has submitted a declaration, but the only member identified out of the otherwise generic statements made in the declaration is Ms. Hazel Piazza. (Rec. Doc. 41-9 ¶ 8). Ms. Piazza did not submit a declaration of her own and like O'Reilly her injuries pertain to the Timber Branch II permit. Thus, Healthy Gulf has failed to establish associational standing to challenge the Ochsner permit. Healthy Gulf has established, however, injury in fact and the other elements of standing as to the Timber Branch II permit through its member Ms. Piazza.

Coalition for Responsible Zoning ("CFRZ") has the burden of showing that at least one of its members has standing to challenge the permits. The Court is persuaded that the declaration of Dr. Ryan Green, a CFRZ member whose property is approximately 30 yards from the proposed extension road, (Rec. Doc. 41-3 ¶ 8), establishes the elements of standing necessary for CFRZ to challenge the Ochsner permit. The declarations of Nancy Wagner (Rec. Doc. 41-7), Elise Read (Rec. Doc. 41-6), William J. Spatz (Rec. Doc. 41-5), and Dr. Green establish CFRZ's standing to challenge the Timber Branch II permit.

Sierra Club (Delta Chapter) has the burden of showing that at least one of its members has standing to challenge the permits. Sierra Club has submitted the declaration of its chapter chair, Mr. David Stets. (Rec. Doc. 41-10). The member identified in his declaration is Ms. Piazza, whose injuries pertain to the Timber Branch II permit not to the Ochsner permit. Mr. Matthew Allen is a member of the Sierra Club's Delta Chapter but his declaration, which refers to concerns with his elderly parents'

property, does not demonstrate that he would have standing to challenge either permit. Thus, Sierra Club has failed to establish associational standing to challenge the Ochsner permit. Sierra Club has established, however, injury in fact and the other elements of standing as to the Timber Branch II permit through its member Ms. Piazza.[9]

### *The Ochsner Permit*

Plaintiffs contend that the Corps' decision to issue the Ochsner permit was arbitrary and capricious or otherwise not in accordance with the law because the Corps violated various mandates of the CWA and NEPA when it issued the permit. Plaintiffs accuse the Corps of simply checking off boxes in the document, reciting boilerplate language, providing no real analysis or detail, and giving cursory or summary treatment to significant issues that federal law required the Corps to consider.

Before proceeding to whether Plaintiffs have shown that the Corps' issuance of the Ochsner permit was arbitrary and capricious, two points must be stressed at the outset. First, as mentioned above, during the public notice period when the Parish's application for the Ochsner permit was under consideration, Plaintiffs did not comment upon or object to the requested permit even though representatives of the plaintiff organizations did meet with the Corps to voice their concerns about the proposed road.

---

[9] Plaintiffs did not break out the standing analysis by substantive claim and by permit, which is what should have been done in this case. Plaintiffs have barely shown standing as to the Ochsner permit and on appeal the Fifth Circuit may conclude that they have completely failed in that showing. As the Court explains later in this opinion, Plaintiffs' decision to join the two separate permits in one lawsuit does not reduce their burden as to each permit, whether the issue is standing or a decision on the merits. The Court notes that a central part of the "injury" that Plaintiffs repeatedly refer to in their briefing, particularly where cumulative impacts are concerned, is catastrophic flooding in homes and businesses, including what occurred in St. Tammany in 2016. But the Court hesitates to conclude that Plaintiffs have shown a concrete or actual or imminent threat of flooding in their own properties. It is not enough that many of the residents in St. Tammany Parish oppose overdevelopment in the area because of concerns about flooding.

In fact, Plaintiffs were very engaged and vocal in getting their concerns about the connector road raised to the Parish's elected officials and the Corps. The decision to proceed with the road both by the Parish and the Corps was not made in ignorance of any of the issues that Plaintiffs now raise. The Court has already explained that it does not agree with the opponents' suggestion that Plaintiffs' failure to object during the public notice period necessarily forecloses the relief that Plaintiffs now seek, (Rec. Doc. 84, Order and Reasons at 3 n.4), but because Plaintiffs did not submit anything during the public notice period, the administrative record upon which the Court's agency-deferential review is based lacks support for many of the contentions that Plaintiffs have raised. One specific example is the argument that the proposed extension road will be ineffective for relieving local traffic congestion in the area or that the road would present safety concerns for motorists. Further, because Plaintiffs did not *formally* present their concerns and objections to the Corps so as to make them part of the administrative record, the failure of the Corps to affirmatively address those concerns and objections in the EA is not a basis to fault the Corps' decision unless the failure to do so is otherwise violative of federal law.

Second, the fact that Plaintiffs chose to challenge the Ochsner permit and the Timber Branch II permit in the same complaint does not combine into one the two separate administrative records upon which the Corps' permitting decisions were based. The Corps and the intervenors have stressed that this case involves two separate permits—one obtained by a municipality and the other by a private party—that resulted from separate applications, for completely separate projects. Plaintiffs' own declarants cast doubt on the suggestion that the proposed Ochsner connector road would be of

use to residents of the proposed Timber Branch II development providing further support for the distinctness of the two projects.[10] (Rec. Doc. 49-10 Spatz declaration ¶ 7; Rec. Doc. 49-11 Read declaration ¶ 29). Yet Plaintiffs' approach in their briefing tends to obfuscate the distinctness of the permits. Notwithstanding Plaintiffs' valid concern regarding the cumulative impacts analysis for each permit in reference to the other—the projects do share geographical and temporal similarities because they are located only one mile apart and the permits were approved within days of each other—it remains that the validity of each permit must be judged on the administrative record supporting it. The more sparse Ochsner administrative record cannot be bolstered by the litigation decision to join the challenge to the Ochsner permit with the challenge to the Timber Branch II permit.

Turning now to the merits of Plaintiffs' challenge to the Ochsner permit, the Corps issued a FONSI and determined that a full EIS was not required for the Ochsner permit. The MOR is the Corps' decision document issued in support of the Ochsner permit. (AR0014-AR0035). "Having reviewed the information provided by the applicant and all interested parties and an assessment of the environmental impacts, [the Corps finds] that this permit action will not have a significant impact on the quality of the human environment." (AR0034).

The Corps made a factual finding that the anticipated environmental consequences and impacts attributed by "this project" would not be significant.

---

[10] Of course, All State has vehemently opposed Plaintiffs' efforts to enjoin the Parish's permit for the Ochsner Blvd. Extension Road. All State explains that it has a vested interest in the Extension Road project because it will benefit the areas surrounding the project. (Rec. Doc. 60, All State TRO opposition at 3). The Parish has not filed a cross motion for summary judgment as to the Ochsner permit, but All State has included such relief as part of its cross motion for summary judgment.

(AR0029). But both NEPA and the CWA require consideration of cumulative impacts, and this is where Plaintiffs focus their challenge to the Ochsner permit. Plaintiffs claim that the failure to properly consider cumulative impacts as required by NEPA rendered the FONSI determination arbitrary and capricious, and then beyond that it violated the CWA.[11] The cumulative impacts requirements for NEPA and the CWA are substantively similar.

Plaintiffs contend that the Corps' cumulative impacts determination for the Ochsner permit lacks any analysis of the cumulative impacts of the extension road in relation to the Timber Branch II development, and the dozens of other § 404 permits that the Corps has issued in conjunction with other wetland fill projects in the same area.[12] The primary cumulative impact that concerns Plaintiffs is how the risk of flooding would be increased from the wetlands authorized to be destroyed in conjunction with the road and with the other projects already permitted in the area. Essentially, Plaintiffs' are contending that insofar as cumulative impacts are concerned, the Corps "entirely failed to consider an important aspect of the problem." *Fath*, 924 F.3d at 136 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

---

[11] One of the intensity factors contained in NEPA's CEQ regulations is "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). Of course another of those intensity factors is the "unique characteristics of the geographic area," such as proximity to wetlands, *id.* § 1508.27(b)(3). But as the Corps points out the presence of wetlands alone cannot foreclose a FONSI because otherwise an EIS would be required every time someone applied for a § 404 permit affecting wetlands, which as a matter of law is not the case.

[12] Plaintiffs clarify that while they argue that the Corps should have considered the impacts of the Ochsner permit and the Timber Branch II permit as part of the cumulative impacts analysis of the other project, their contention is not that the Corps piecemealed the two applications by not considering them together. (Rec. Doc. 41-14 at 15 n.9).

Plaintiffs also point out that the area where the extension road will be built is largely undeveloped right now. But once the road is built there will be an incentive to develop further. So additional development in the area should be considered a reasonably foreseeable future impact when considering cumulative impacts.

The Corps acknowledged that "[cumulatively, similar projects as well as new development off of the new roadway could have a long-term impact on the aquatic ecosystem." (AR0024). But Plaintiffs accuse the Corps of providing no analysis of this long-term impact or apparently failing to take into account the numerous other 404 fill projects that have been permitted and allowed to destroy hundreds of acres of wetlands in the vicinity. The Corps did not expressly list those other permits in the MOR. As Plaintiffs point out the Corps has in its records all projects it has permitted within three miles of the site and certainly all permits issued for this same watershed. (Rec. Doc. 30, Answer ¶ 124).

The Corps was required to consider the cumulative impacts of the Ochsner extension road under NEPA, the CWA, and implementing regulations. The Corps determined that the geographic scope for the cumulative effects assessment is the Liberty Bayou-Tchefuncte area, which is not disputed. (AR0029). The Corps determined that the direct effects of the proposed project "would be but not limited to" habitat loss, water and air quality, noise, and energy consumption. (AR0029). Indirect effects of the proposed project "would be but not limited to" traffic, noise, and continued impacts to the ecosystem within the region. (*Id.* § 9.1). But the Corps determined that the environmental impacts attributable to the project would not be significant. (*Id.* § 9.5).

Section 9.7 of the MOR contains the Corps' conclusions regarding cumulative impacts.

That section reads:

> When considering the overall impacts that will result from the proposed activity, in relation to the overall impacts from past, present, and reasonably foreseeable future activities, the incremental contribution of the proposed activity to cumulative impacts in the [Liberty Bayou-Tchefuncte area], are not considered to be significant. Compensatory mitigation will be required to help offset the impacts to eliminate or minimize the proposed activity's incremental contribution to cumulative effects within the [Liberty Bayou-Tchefuncte area]. Mitigation required for the proposed activity is discussed in Section 8.0.

(AR0029-AR0030).

Plaintiffs correctly point out that the MOR does not discuss any of the past § 404 permits issued for the Liberty Bayou-Tchefuncte area and it does not mention the Timber Branch II permit. The Court has previously observed that Plaintiffs' criticisms of the cumulative impacts section of the MOR are not exaggerated. (Rec. Doc. 84, Order and Reasons at 12). Of course, the Corps correctly points out that lack of detail does not necessarily render any of the determinations contained in the MOR to be arbitrary and capricious. The Court remains persuaded (as it explained when denying preliminary relief) that the administrative record does not demonstrate that the Corps failed to consider the collective impacts of other § 404 permits in the area, including the Timber Branch II permit, when it issued the Ochsner permit. Even though Plaintiffs did not comment during the public notice period, representatives of the plaintiffs' interests met with personnel from the Corps to explain the potential problems with the extension road. Plaintiffs' concerns are legitimate but this is not a case where the Corps has issued a decision counter to the evidence in the record, and it is not a case where there was only one permissible decision to be made.

Further, the Court is persuaded that the possibility that the extension road might prove an attractive lure to further development at some point in the future, while plausible (the Corps did acknowledge this possibility), is too speculative to constitute a reasonably foreseeable impact and issuing the permit for the connector road.

The Corps did not reach the decision urged by Plaintiffs but the Court is not persuaded that the concise nature of the MOR renders the Corps' FONSI determination or the permitting decision arbitrary and capricious for failure to consider what the CWA and NEPA required as to cumulative impacts. The fact that the MOR does not expressly list the past § 404 permits issued for the Liberty Bayou-Tchefuncte area or the Timber Branch II permit does not *ipso facto* mean that the Corps did not consider the cumulative impacts of those permitting decisions when issuing the FONSI and then ultimately the permit itself.

Next, Plaintiffs argue that the Corps violated the CWA's 404(b)(1) guidelines because the MOR does not explain how the mitigation measures employed—the purchase of mitigation bank credits—compensates for the environmental impacts of the project. Plaintiffs complain that the Corps failed to articulate how the mitigation measures are related to the FONSI, which may implicate NEPA if the mitigation was relied upon to reduce the project's significance level before the threshold required for a full-blown EIS.

The Corps determined that compensatory mitigation would be required to offset environmental losses resulting from proposed unavoidable impacts to waters of the United States. (AR0027). Because the proposed project would directly impact approximately 16 acres of pine flatwood/savanna, the Parish purchased 40.6 acres of

pine flatwood/savanna. (AR0028). The LRAM method was used to determine the

mitigation amount.[13] (*Id.* § 8.4). The Corps made a factual determination that

compensatory mitigation for the Ochsner proposal would help alleviate the loss of

wetland habitat functions realized by the construction activities. (AR0024). The Corps

also indicated that the impact was in the service area of an approved mitigation bank.

(AR0027).

 The Corps did not rely on mitigation to arrive at the FONSI when it issued the

Ochsner permit so the Ochsner permit was not issued based on a mitigated FONSI. In

*Atchafalaya Basinkeeper*, the Fifth Circuit stressed the difference between a FONSI

with accompanying compensatory mitigation and a mitigated FONSI. 894 F.3d at 698.

In this case the Corps' failure to relate the mitigation measures to the FONSI was not

arbitrary and capricious because the FONSI was not based on mitigation.

 As Plaintiffs point out the MOR does not contain a narrative explanation as to

how the mitigation bank credits would compensate for any cumulative impacts, such as

the loss of the flood-absorbing capacity of the wetlands being destroyed by the project.

But the Corps had already concluded that the unmitigated impacts anticipated from the

Ochsner project would not be significant. (AR0029). This factual finding is not arbitrary

and capricious based on the administrative record, which contains no evidence as to

how the wetlands directly impacted by the project contribute to flood control in the

watershed. The Corps' conclusion that the purchase of 40.6 acres of pine

---

[13] The Fifth Circuit gave in depth consideration to the Louisiana Wetland Rapid Assessment Method, or LRAM, in its *Atchafalaya Basinkeeper v. United States Army Corps of Engineers* decision, 894 F.3d 692, 699-700 (5th Cir. 2018). The LRAM is a type of "functional assessment" tool that the CWA regulation advises "should be used" to "determine how much compensatory mitigation is required." *Id.* at 700 (quoting 33 C.F.R. § 332.3(f)(1)).

flatwood/savanna would be sufficient compensatory mitigation for the loss of the wetlands necessary to complete the extension road is not arbitrary and capricious.

Next, Plaintiffs argue that the Corps violated NEPA and the CWA because the Corps did not conduct an alternatives analysis in accordance with the governing regulations. In cases where the proposed project is not water dependent, the 404(b)(1) guidelines mandate a presumption that practicable alternatives "that do not involve special aquatic sites" are available "unless clearly demonstrated otherwise." *Id.* § 230.10(a)(3). The Ochsner extension road is not water-dependent. (AR0015). Plaintiffs complain that the Corps did not require the Parish to rebut the practicable alternatives presumption even though the 404(b)(1) guidelines required it. Plaintiffs complain that alternatives were addressed in a one-page letter from the Parish engineer to the Corps (AR108), which gave no clear or reasoned explanation for why the road location was the least environmentally damaging alternative.

The Corps discussed the no action alternative, and two off-site alternatives were submitted. (AR0018). The two off-site alternatives were not practicable due to significant right-of-way problems, construction costs, and major traffic disruptions during construction. (*Id.*). The no action alternative was rejected because even though there would be no adverse environmental consequences in doing nothing, the local traffic conditions (and safety) would not be improved and the other potential benefits associated with the project would be lost. (*Id.*).

The Parish submitted to the Corps on-site alternatives with eight different alignments. (*Id.*). The Corps was satisfied that the alignment preferred by the Parish provided the shortest route/length between Ochsner Boulevard and LA Highway 1077

and required less acreage and wetlands to be impacted. (AR0019). The chosen site addressed the Parish's needs while minimizing and avoiding adverse impacts to wetlands. (*Id.*). The Corps was persuaded that the project was designed to the minimum width necessary to meet the desired goal. (AR0014).  All work shall be conducted within the right of way and hauled in fill shall come from a clean site chosen by the contractor. (AR0014).

The MOR provides sufficient explanation as to why certain alternatives were not chosen and why the Parish's preferred alternative was actually the most environmentally friendly. That the MOR does not include an express analysis of the non-water dependent presumption imposed by the 404(b)(1) guidelines does not render the Corps' decision arbitrary or capricious. The record establishes that the Corps was aware of the presumption and the record contains evidence sufficient to rebut it. *Town of Abita Springs*, 153 F. Supp. 3d at 921. Further, the Court finds nothing problematic in the fact that the Corps did not require the Parish to submit the Lambert Consultants study underlying the letter that the Lambert consultant submitted in support of the project, (AR0109), or that the Parish did not submit a traffic study in support of the connector road. The Corps, whose business is to evaluate/issue dredge and fill permits consistent with the CWA not to design effective traffic control measures, was entitled to rely on the Parish's plausible conclusion (supported by its consultant) that the proposed road would be effective in alleviating traffic problems in the area. The administrative record does not contradict this conclusion.

In sum, Plaintiffs have not demonstrated that the Corps' decision to issue the Ochsner permit MVN-2017-00075-EPP was arbitrary and capricious. Plaintiffs' motion

for summary judgment is therefore granted as to the issue of CFRZ's standing to challenge the Ochsner permit and denied in all other respects as to the Ochsner permit. The Corps' and All State's cross motions for summary judgment are granted as to the Ochsner permit.

### The Timber Branch II Permit

As with the Ochsner permit, Plaintiffs contend that the Corps' decision to issue the Timber Branch II permit was arbitrary and capricious or otherwise not in accordance with the law because the Corps violated various mandates of the CWA and NEPA when it issued the permit.

Before proceeding to whether Plaintiffs have shown that the Corps' issuance of the Timber Branch II permit was arbitrary and capricious, the Court first considers the role of the Fifth Circuit's 2007 decision in *O'Reilly*, *supra*. *O'Reilly* was an appeal of this Court's ruling enjoining the § 404 permit issued by the Corps in 2003 for Phase I of a project called Timber Branch involving the same tract of land at issue herein. No. 04-940, 2004 WL 1794531. That permit was issued to the prior owner of the land—not to All State—and it was based on a different development/design plan for Timber Branch II.

This Court had determined that the Corps' FONSI was arbitrary and capricious and that the Corps must prepare a full-blown EIS. *Id.* at *6. On appeal, the Fifth Circuit agreed that the FONSI violated NEPA, but the panel was not persuaded that the permit should be enjoined until the Corps prepared an EIS. *O'Reilly*, 477 F.3d at 234. Rather, the appropriate remedy was to allow the Corps to correct the deficiencies in its EA which could potentially cure the problems identified with the FONSI. *Id.* The Fifth Circuit

did not vacate the injunction against the 2003 permit but rather amended it "enjoin[ing] the Corps from issuing a § 404 permit *herein* until further orders of the district court consistent with this opinion," and remand[ing] the case to the Corps for further proceedings including the preparation of a new EA, a new FONSI, or an EIS or other appropriate disposition, consistent with this opinion." *Id.* at 240-41 (emphasis added).

It was over fifteen years ago when the court of appeals issued its opinion which left in place the amended injunction and remanded the case to the Corps. Presumably, the former owner of the tract abandoned the plans for the Timber Branch I project because it appears that no further action was taken to correct the problems with the 2003 Timber Branch permit. At some point in time All State purchased the land and then initiated the permit process anew in 2018. There is nothing in the administrative record to suggest that All State or the Corps relied in any manner on the prior owner's application and permit. There has been no suggestion of collusion with the former owner in order to circumvent the court of appeals' amended injunction.

The Corps and All State stress that the instant case involves a different applicant, a different project, a different decision document, and a different Corps permit than the 404 permit issued in 2003. (Rec. Doc. 91-1 at 11 n.3). All State argues that it cannot be bound by anything in the prior litigation because it did not own the property at the time and was not the permittee when the injunction was issued.

While Plaintiffs suggest that the prior *O'Reilly* case forms a "part of the history of proceedings in this matter," (Rec. Doc. 41-14 at 3 n.2), they do not argue that the Timber Branch II permit currently at issue is void for having been issued in defiance of an extant injunction. But what Plaintiffs point out is that the concerns with Timber

Branch I that were raised in 2003 are worse today due to the rapid and seemingly unchecked permitting and development taking place in the area in recent years, making the Corps' decision to issue the Timber Branch II permit all the more egregious.

The Court is persuaded that the Corps' issuance of the current Timber Branch II permit did not violate the injunction left in place by the Fifth Circuit's 2007 decision. Thus, while the prior *O'Reilly* decision perhaps should not be ignored completely because it did involve the same tract of land and a development similar in design,[14] it does not provide legally preclusive effect in this case.[15] Nor does the administrative record upon which that permit was based (amassed from 1999 when the former owner began the application process to 2003 when the permit was issued) or the 2003 decision document form a part of the administrative record currently before the Court.

Turning then to the merits of Plaintiffs' challenge to the Timber Branch II permit, the Corps issued a FONSI and determined that a full EIS was not required for the Timber Branch II permit. The MOR is the Corps' decision document issued in support of the permit. (TB-AR0021). "Having reviewed the information provided by the applicant

---

[14] All State points out that the prior application was for 81.58 acres with 39.54 acres of wetlands affected whereas All State's Timber Branch II impacts less wetlands and is smaller in scope. Also, the administrative record contains all new site analysis, hydraulic studies, and alternative site analysis.

[15] Besides the legitimate differences between the facts underlying the 2003 permit and the one at issue here, the Court does not interpret the Fifth Circuit's 2007 injunction as intending to restrain use of the land itself in perpetuity. The problem with the 2003 permit was the deficiencies in the decision document supporting it. Again, All State applied for the Timber Branch II permit anew relying on nothing from the former owner's application and the Corps prepared a new decision document. The Court does not interpret the Fifth Circuit's injunction to preclude consideration of a new § 404 permit under those circumstances.

     The Corps and All State also stress that unlike the instant case, *O'Reilly* dealt with a mitigated FONSI which the Fifth Circuit in more recent jurisprudence has relied upon when distinguishing *O'Reilly*. *See, e.g., Atchafalaya Basinkeeper*, 894 F.3d at 698-99.

and all interested parties and an assessment of the environmental impacts, [the Corps finds] that this permit action will not have a significant impact on the quality of the human environment." (TB-AR0043). Therefore, the Corps concluded that an EIS would not be required. *Id.*

The Corps identified direct effects of the proposed project as (but not limited to) habitat loss, water and air quality, noise and energy consumption. Indirect effects of the proposed project would be (but not limited to) increased traffic, noise, and continued impact to the ecosystem within the region. (TB-AR0038). The Corps made a factual finding that the anticipated environmental consequences and impacts attributed by "this project" would not be significant. (TB-AR0038). The Corps considered the public interest review factors when deciding to issue the permit and concluded that the majority of them were beneficial. (TB-AR0034-0035).

As explained above, NEPA's regulations required the Corps to consider both context and intensity in determining whether a project's effects are significant enough to require a full EIS. *See* 40 C.F.R. § 1508.27. But the ten intensity factors listed in the CEQ regulation are not categorical rules; rather, they guide the agency's determination. *Spiller v. White,* 352 F.3d 235, 243 (5th Cir. 2003). An agency's decision document is not deficient simply because the agency does not separately and directly address each of the factors. *Id.* And a FONSI is not arbitrary and capricious simply because it implicates one or more of the intensity factors. *See id.*

The intensity factors implicated herein are the unique characteristics factor of § 1508.27(b)(3) because wetlands are involved, the cumulative impacts factor of § 1508.27(b)(7), the latter of which Plaintiffs focus upon, and arguably the precedent

factor of § 1508.27(b)(6), in light of Plaintiffs' concerns about future phases of the Timber Branch development. Plaintiffs argue that the Corps failed to properly consider cumulative impacts as required by NEPA rendering the FONSI determination arbitrary and capricious, and then beyond that the Corps violated the CWA because that body of law also requires consideration of cumulative impacts. As with the Ochsner permit, Plaintiffs' argument is that the Corps failed to consider the cumulative impacts of the Timber Branch II permit both in relation to the Ochsner permit and to the numerous other 404 permits issued in the Liberty Bayou-Tchefuncte area in recent years. The specific adverse cumulative impact that Plaintiffs stress is the potential for flooding in the area given that wetlands generally serve a valuable flood-absorbing function.

In the MOR the Corps acknowledged that "[c]umulatively, similar projects could have a long-term impact on the aquatic ecosystem." (TB-AR0032). But in its conclusions regarding cumulative impacts, the Corps stated that "the incremental contribution of the proposed activity to cumulative impacts in the area . . . are not considered to be significant." (TB-AR0038). The Corps determined that flood hazards associated with the project would be "negligible." (TB-AR0034). The Corps determined that "[w]ater circulation will be altered at the project site due to the redirection of flow via subsurface drainage towards the dry retention pond." (TB-AR0032).

As with the Ochsner permit's MOR, the Court is not persuaded that the Corps simply failed to consider the cumulative impacts of the Timber Branch II permit when concluding that the impacts would not trigger the need for an EIS under NEPA's regulations. The administrative record that accompanies the Timber Branch II permit is robust and evinces significant involvement of Plaintiffs and other concerned citizens

during the thirty-three months that the permit application was pending. But in concluding

that the flooding impact of Timber Branch II itself would be negligible, the Corps

implicitly resolved against Plaintiffs the factual questions pertaining to Timber Branch

II's flood zone designation, its potential to contribute to flooding in the area, and the

anticipated efficacy of the dry retention pond.

The Timber Branch II project appears to be located in FEMA flood zone X. (TB-

AR AR0123). To help allay flooding concerns raised during the public notice period, All

State modified its project design to include a dry retention pond to increase storm water

retention. Modeling concluded that the proposed drainage modifications and the dry

retention pond, with 91.1 acre-feet of storage, would decrease predevelopment peak

discharge of floodwater runoff by over 25 percent. (TB-AR0181-184). The hydrologic

analysis performed for the Timber Branch II project shows that it complies with the

Parish's ordinances requiring 25% or more reduction in pre-development runoff. (TB-

AR0099, 178-249).

In reaching its significance findings, the Corps credited the McHugh hydrologic

analysis submitted by All State in support of the project, (TB-AR0176), which suggests

that Timber Branch II's design will actually decrease floodwater runoff. (TB-AR0181-

184). The Corps chose not to rely upon the study submitted by Dr. Koob, which

supports Plaintiffs' contentions regarding flooding in the area. (TB-AR0367).

Based on the administrative record, the Corps' significance conclusions,

including with respect to the potential for flooding impacts attributable to Timber Branch

II, are not arbitrary and capricious. But Plaintiffs argue that the FONSI was arbitrary and

capricious because the Corps did not consider the cumulative flooding impacts

attributable to Timber Branch II. In support of this contention Plaintiffs point out that the MOR does not discuss any of the other projects (including the Ochsner extension road) that the Corps has permitted in the area (even though it has those records in its archives), it does not reference the reasonably foreseeable future development of the rest of the 200-acre tract of land surrounding the proposed Timber Branch II site, and it fails to even mention St. Tammany's catastrophic flooding event of 2016.

Of course, as the Corps points out, NEPA does not prescribe any specific method of analyzing cumulative impacts. And mindful that consideration of cumulative impacts under NEPA's CEQ's regulations constitutes just one of the ten non-categorial factors to guide the agency's permitting decision, the Court is not persuaded that the Corps' FONSI for Timber Branch II was arbitrary and capricious for failure to consider cumulative flooding impacts in the region. The concerns regarding flooding in the area due to overdevelopment were discussed at length in Dr. Koob's study which is part of the administrative record. (TB-AR0367). Even if the Corps had made a factual determination that the destruction of wetlands in the Liberty Bayou-Tchefuncte area is contributing to destructive flooding property in the area, and assuming that this is factually correct, the Corps' FONSI would not *ipso facto* have been arbitrary and capricious.

Plaintiffs argue that the Corps' FONSI was also arbitrary and capricious because the Corps did not consider the reasonably foreseeable impacts associated with future phases of the Timber Branch II development, which recent events have demonstrated are in the works. Given those recent events such as the land-owner seeking zoning variances, and showing expansion plans to neighbors, the expansion of Timber Branch

II at some point in the future is more than speculative. But the events that Plaintiffs point to occurred many months after the Corps' permitting decision and therefore do not render the Corps' failure to address future aspects of Timber Branch II arbitrary and capricious.

The administrative record supports the Corps' contention that it considered potential impacts on the floodplains but ultimately concluded there was no significant impact. Plaintiffs have not demonstrated that the FONSI was arbitrary and capricious for failure to properly consider cumulative impacts. The Corps' decision that no EIS was required did not violate NEPA at least insofar as cumulative impacts are concerned.[16]

Plaintiffs argue that another basis for concluding that the FONSI was arbitrary and capricious is that the Corps failed to articulate how the mitigation measures required for the Timber Branch II permit are related to the FONSI. Plaintiffs complain that the EA does not expressly foreclose that the Corps relied on mitigation measures to reduce the impact levels below the significance threshold requiring a full-flown EIS. Further, the Corps failed to explain how the mitigation credits compensate for the localized environmental impacts of the Timber Branch II development, including the loss of flood-absorbing capacity.

The MOR describes the types of avoidance and mitigation measures required by Corps' regulations, the type of compensatory mitigation required, and the amount of acreage as calculated using the LRAM. (TB-AR0036-37; TB-AR0060-64). The Corps

---

[16] The Court recognizes that the CWA also requires consideration of cumulative impacts but the Court is not persuaded that the specific cumulative impacts concerns raised by Plaintiffs actually implicate the CWA's zone of interests pertaining to the discharge of dredge or fill materials into navigable waters.

required All State to purchase 58.4 acres of pine flatwood/savanna wetland from mitigation banks for Timber Branch II. (TB-AR0056). The Corps determined the "compensatory mitigation should minimize any negative impacts to wetland resources." (TB-AR0030).

There is no suggestion from either the MOR or the administrative record that the mandatory mitigation measures are related to the FONSI, in other words, that the Corps relied on the mitigation measures to reduce the potential impacts of Timber Branch II below the significance level that would have triggered an EIS. The Corps did not reference mitigation in the FONSI, (TB-AR0043), and the mitigation is expressly referred to as compensatory in nature, (TB-AR0021). The Corps concluded that the potential impacts from the permit would not meet the "significance" threshold under NEPA that would require an EIS regardless of mitigation. The FONSI was not arbitrary and capricious for failing to relate the required mitigation measures to the FONSI.

Plaintiffs argue that the Corps violated NEPA and the CWA because it did not consider whether the Timber Branch II project as sited in the permit is the least damaging alternative. It is undisputed that the Timber Branch II project is not "water dependent" therefore the guidelines impose a presumption that practicable alternatives to wetlands exist. Plaintiffs complain that the Corps did not hold All State to its burden of rebutting the presumption but merely accepted All State's alternative sites analysis without subjecting it to an independent analysis. Further, Plaintiffs complain that the

Corps gave too much consideration to the applicant's profit and economic

considerations when approving the Timber Branch II alternative selected by All State.[17]

In support of the permit application All State submitted a detailed site analysis for

alternatives. (TB-AR0104-0166). The alternative site analysis performed by Blossman

Appraisal Service outlines in detail the requirements of the Timber Branch II project and

the practicable alternatives in light of the project's goals. The Corps therefore

considered seven (7) offsite alternatives and two (2) onsite alternatives. (TB-AR0026-

0028). The Corps ultimately determined that All State's preferred alternative impacted

the least amount of wetlands while still maintaining the overall project goals. (TB-

AR0027).

The criteria and/or scope of the proposed Timber Branch II project which

included availability, location, proximity, zoning, highway access, and size, affected

practicability of alternatives. (TB-AR0026). Some of the alternatives did not have the

requisite acreage to support the development, did not have the necessary zoning, were

located in an AE flood plain, and/or impacted a larger portion of jurisdictional wetlands,

rendering them not practicable. (TB-AR0026-0027). Timber Branch II requires certain

zoning requirements in order to support the development, including zoning for

commercial and residential properties.(TB-AR0124). Four of the alternatives could not

meet the necessary zoning requirements, and other alternatives could not meet the size

requirements or impacted more wetlands than the proposed site. Further, other issues

affected the practicability of the other alternatives such as flood zones, soil content,

---

[17] Neither NEPA nor the CWA prohibit the Corps from considering the economics of alternatives being considered. The Corps did consider All State's profitability but it did not give undue weight to that consideration.

availability of central water, sewage, and utilities, parcel size and pre-existing property claims (TB-AR026-27; TB-AR0104-166).

Two possible on-site alternatives were considered. First, the chosen site plan which would impact 24.82 acres of wetlands and avoid .24 acres by redesign of part of the project. (TB-AR0027). The second on-site alternative was the original Timber Branch II design which was larger in scope and would have impacted a total of 24.66 acres of wetlands. Thus, All State's preferred alternative impacted slightly less wetlands of the other on-site alternative. (TB-AR0027).

The Corps considered one no-action alternative. (TB-AR0026-27). As expected the Corps determined that the no action alternative would avoid all adverse environmental impacts associated with the development and have the least impact on wetlands. (*Id.*). But the no action alternative would not meet the needs of the applicant and the potential benefits of Timber Branch II, *e.g.*, "additional commercial and residential opportunities, economic benefits in the form of wages, materials purchased, property taxes, and jobs," would not be realized. (TB-AR0026-27).

Insofar as NEPA is concerned, which does not militate in favor of environmentally-friendly alternatives, the Corps was not arbitrary and capricious in its consideration of practicable alternatives.

Insofar as the CWA is concerned, the Corps evaluated whether the alternatives were practicable as that term is defined in 40 C.F.R. § 230.10(a)(2), and determined that each alternative was not practicable. The Corps determined that development of any of these alternatives would cause more adverse impacts to wetlands than development of the subject property. (TB-AR0026-28). The Corps complied with the

404(b)(1) guidelines and 40 C.F.R. § 230.10(a) by reviewing, analyzing, and then concluding that the "no-action alternative" and the several other alternatives (both off-site and on-site) were "not practicable."

Further, the record does not demonstrate that the Corps failed to consider and that All State failed to rebut the presumption applied in cases where the proposed project is not water dependent. The CWA is not violated simply because the presumption was not expressly mentioned in the MOR, *see Town of Abita Springs*, 153 F. Supp. 3d at 921, and the administrative record contains sufficient evidence to rebut the presumption as to no practicable alternatives not involving wetlands. Plaintiffs cannot prevail on their CWA arguments regarding the Timber Branch II project alternatives and the applicable presumptions under § 230.10(a).

Finally, the Court is not persuaded that either NEPA or the CWA was violated because the Corps did not commission its own alternatives studies but rather relied upon the Blossman report submitted by All State. The Corps is surely aware that applicants are not likely to submit reports that fail to support their preferred alternative. The Corps' decision to credit the Blossman report does not lead to an inescapable conclusion that the Corps simply "rubberstamped" All State's contentions. The Court agrees that it is of no consequence that the Corps did not engage its own experts to prepare an alternative site analysis report.

In sum, Plaintiffs have not demonstrated that the Corps' decision to issue the Timber Branch II permit MVN-2018-0215-EPP was arbitrary and capricious. Plaintiffs' motion for summary judgment is therefore granted as to the issue of standing to challenge the Timber Branch II permit and denied in all other respects as to the Timber

Branch II permit. The Corps' and All State's cross motions for summary judgment are granted as to the Timber Branch II permit.

Accordingly;

**IT IS ORDERED** that the **Motion for Summary Judgment (Rec. Doc. 41)** filed by the plaintiffs, Loretto O'Reilly, Healthy Gulf, Coalition for Responsible Zoning, and the Sierra Club and its Delta Chapter is **GRANTED IN PART AND DENIED IN PART** as explained above.

**IT IS FURTHER ORDERED** that the **Cross Motion for Summary Judgment (Rec. Doc. 89)** filed by All State Financial Co. and the **Cross Motion for Summary Judgment (Rec. Doc. 91)** filed by the United States Army Corps of Engineers and Lt. General Scott A. Spellmon are **GRANTED** as explained above.

August 15, 2022

_____
JUDGE JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE